| | |
|---|---|
| STATE OF SOUTH CAROLINA | IN THE COURT OF COMMON PLEAS |
| COUNTY OF CHESTERFIELD | |

Daniel Watson, as Personal Representative of the Estate of David W. Watson, deceased,

**CIVIL ACTION COVERSHEET**

Plaintiff(s)

2012-CP - 13- 000681

vs.

Robert A. Adams, et al.,

Defendant(s)

(Please Print)
Submitted By: Patrick J. McLaughlin
Address: P. O. Box 13057, Florence, SC 29504-3057

SC Bar #: 73675
Telephone #: 843-669-5634
Fax #: 843-669-5150
Other:
E-mail: patrick@wukelalaw.com

NOTE: The cover sheet and information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is required for the use of the Clerk of Court for the purpose of docketing. It must be filed out completely, signed, and dated. A copy of this cover sheet must be served on the defendant(s) along with the Summons and Complaint.

## DOCKETING INFORMATION (Check all that apply)
*If Action is Judgment/Settlement do not complete*

- ☒ **JURY TRIAL** demanded in complaint.    ☐ **NON-JURY TRIAL** demanded in complaint.
- ☐ This case is subject to **ARBITRATION** pursuant to the Court Annexed Alternative Dispute Resolution Rules.
- ☐ This case is subject to **MEDIATION** pursuant to the Court Annexed Alternative Dispute Resolution Rules.
- ☐ This case is exempt from ADR. (Proof of ADR/Exemption Attached)

## NATURE OF ACTION (Check One Box Below)

| **Contracts** | **Torts - Professional Malpractice** | **Torts – Personal Injury** | **Real Property** |
|---|---|---|---|
| ☐ Constructions (100) | ☐ Dental Malpractice (200) | ☐ Assault/Slander/Libel (300) | ☐ Claim & Delivery (400) |
| ☐ Debt Collection (110) | ☐ Legal Malpractice (210) | ☐ Conversion (310) | ☐ Condemnation (410) |
| ☐ Employment (120) | ☐ Medical Malpractice (220) | ☐ Motor Vehicle Accident (320) | ☐ Foreclosure (420) |
| ☐ General (130) | Previous Notice of Intent Case # | ☐ Premises Liability (330) | ☐ Mechanic's Lien (430) |
| ☐ Breach of Contract (140) | 20____-CP-____-____ | ☐ Products Liability (340) | ☐ Partition (440) |
| ☐ Other (199) | ☐ Notice/ File Med Mal (230) | ☐ Personal Injury (350) | ☐ Possession (450) |
| | ☐ Other (299) | ☒ Wrongful Death (360) | ☐ Building Code Violation (460) |
| | | ☐ Other (399) | ☐ Other (499) |

| **Inmate Petitions** | **Judgments/Settlements** | **Administrative Law/Relief** | **Appeals** |
|---|---|---|---|
| ☐ PCR (500) | ☐ Death Settlement (700) | ☐ Reinstate Driver's License (800) | ☐ Arbitration (900) |
| ☐ Mandamus (520) | ☐ Foreign Judgment (710) | ☐ Judicial Review (810) | ☐ Magistrate-Civil (910) |
| ☐ Habeas Corpus (530) | ☐ Magistrate's Judgment (720) | ☐ Relief (820) | ☐ Magistrate-Criminal (920) |
| ☐ Other (599) | ☐ Minor Settlement (730) | ☐ Permanent Injunction (830) | ☐ Municipal (930) |
| | ☐ Transcript Judgment (740) | ☐ Forfeiture-Petition (840) | ☐ Probate Court (940) |
| | ☐ Lis Pendens (750) | ☐ Forfeiture—Consent Order (850) | ☐ SCDOT (950) |
| | ☐ Transfer of Structured Settlement Payment Rights Application (760) | ☐ Other (899) | ☐ Worker's Comp (960) |
| | | | ☐ Zoning Board (970) |
| | ☐ Other (799) | | ☐ Public Service Commission (990) |

| **Special/Complex /Other** | | | |
|---|---|---|---|
| ☐ Environmental (600) | ☐ Pharmaceuticals (630) | | ☐ Employment Security Comm (991) |
| ☐ Automobile Arb. (610) | ☐ Unfair Trade Practices (640) | | |
| ☐ Medical (620) | ☐ Out-of State Depositions (650) | | ☐ Other (999) |
| ☐ Other (699) | ☐ Motion to Quash Subpoena in an Out-of-County Action (660) | | |
| | ☐ Sexual Predator (510) | | |

**Submitting Party Signature:** _____     **Date:** November 2, 2012

**Note:** Frivolous civil proceedings may be subject to sanctions pursuant to SCRCP, Rule 11, and the South Carolina Frivolous Civil Proceedings Sanctions Act, S.C. Code Ann. §15-36-10 et. seq.

SCCA / 234 (01/2011)

STATE OF SOUTH CAROLINA     )     IN THE COURT OF COMMON PLEAS
                             )     FOURTH JUDICIAL CIRCUIT  000681
COUNTY OF CHESTERFIELD     )     CIVIL ACTION NO: 2012-CP-13-_____

DANIEL WATSON, as Personal     )
Representative of the Estate of DAVID     )
W. WATSON, deceased,     )
                             )
        Plaintiff,     )
                             )
vs.     )
                             )
ROBERT A. ADAMS in his individual     )
capacity as an officer with the Chesterfield     )
Police Department; ERIC HEWITT in his     )     **SUMMONS FOR RELIEF**
individual capacity as Chief of the     )     **(COMPLAINT SERVED)**
Chesterfield Police Department; LESLIE     )     (Jury Trial Demanded)
DAVIS in his individual capacity as a     )
Lance Corporal with the South Carolina     )
Highway Patrol; CHESTERFIELD     )
POLICE  DEPARTMENT and SOUTH     )
CAROLINA DEPARTMENT OF     )
PUBLIC SAFETY;     )
                             )
        Defendants.     )
                             )



TO THE DEFENDANTS ABOVE NAMED:

        YOU ARE HEREBY SUMMONED and required to answer the Complaint in this action,

of which a copy is hereby served upon you, and to serve a copy of your answer to the said

Complaint on the subscribers at their offices at 403 Second Loop Road, Florence, South Carolina

within thirty (30) days after the service hereof, exclusive of the day of such service; and if you fail

to answer the Complaint within the time aforesaid, the Plaintiff in this action will apply to the

Court for the relief demanded in the Complaint and judgment by default will be rendered against

you.

Patrick J. McLaughlin
Wukela Law Firm
P.O. Box 13057
Florence, South Carolina 29504-3057
Telephone: 843-669-5634
Facsimile: 843-669-5151
Attorney for the Plaintiff

Franklin B. Joyner, Jr.
Joyner Law Firm
P.O. Box 1434
Cheraw, SC   29520
Telephone:   843-253-5316
Facsimile:   843-2536-5318
Email:   jrjoynerlaw@gmail.com
Attorney for the Plaintiff

November 2, 2012

STATE OF SOUTH CAROLINA      )      IN THE COURT OF COMMON PLEAS
                               )      FOURTH JUDICIAL CIRCUIT

COUNTY OF CHESTERFIELD      )      CIVIL ACTION NO: 2012-CP-10-00681

DANIEL WATSON, as Personal      )
Representative of the Estate of DAVID      )
W. WATSON, deceased,      )
                               )
       Plaintiff,      )      COMPLAINT
                               )      (WRONGFUL DEATH)
vs.      )      JURY TRIAL DEMANDED
                               )
ROBERT A. ADAMS in his individual      )
capacity as an officer with the      )
Chesterfield Police Department; ERIC      )
HEWITT in his individual capacity as      )
Chief of the Chesterfield Police      )
Department; LESLIE DAVIS in his      )
individual capacity as a Lance Corporal      )
with the South Carolina Highway Patrol;      )
CHESTERFIELD POLICE      )
DEPARTMENT and SOUTH      )
CAROLINA DEPARTMENT OF      )
PUBLIC SAFETY;      )
                               )
       Defendants.      )
_____ )

2012 NOV 2   FAYE L. SELLEY   CLERK   CHESTER...

A True Copy, Attest

Jaye O. Sell...

CLERK OF COURT C.P. & G.S.
CHESTERFIELD COUNTY, SC

Comes now the Plaintiff Daniel Watson, as personal representative of the Estate of David

Watson, hereinafter "WATSON," complaining of the Defendants and allege the following:

**PARTIES AND JURISDICTION**

1.      That Plaintiff WATSON at all times relevant to this complaint was a resident of Cheraw,

       Chesterfield County, South Carolina.

2.      The Defendant Robert A. Adams, hereinafter ADAMS, was at all times herein an officer

       with the CHESTERFIELD POLICE DEPARTMENT, acting under color of state law in

       the course and scope of his employment as a law enforcement officer.   Defendant

ADAMS is sued, in the alternative, individually under state law if his conduct is found to have been outside the course and scope of his employment.

3.     That Defendant Eric Hewitt, hereinafter HEWITT, was at all times herein the Chief of the CHESTERFIELD POLICE DEPARTMENT, acting under color of state law in the course and scope of his employment as a law enforcement officer. Defendant HEWITT is sued, in the alternative, individually under state law if his conduct is found to have been outside the course and scope of his employment.

4.     The Defendant Leslie Davis, hereinafter DAVIS, was at all times herein an officer with the SOUTH CAROLINA DEPARTMENT OF PUBLIC SAFETY, acting under color of state law in the course and scope of his employment as a law enforcement officer. Defendant DAVIS is sued, in the alternative, individually under state law if his conduct is found to have been outside the course and scope of his employment.

5.     That Defendant CHESTERFIELD POLICE DEPARTMENT, hereinafter "CPD" is the appropriate party defendant as a state agency for the acts and omissions of its agents/employees in the course and scope of their employment and/or official duties pursuant to the South Carolina Tort Claims Act. Defendant CPD is sued for compensatory damages only.

6.     That Defendant SOUTH CAROLINA DEPARTMENT OF PUBLIC SAFETY, hereinafter "SCDPS", is the appropriate party defendant as a state agency for the acts and omissions of its agents/employees in the course and scope of their employment and/or official duties pursuant to the South Carolina Tort Claims Act. Defendant SCDPS is sued for compensatory damages only.

7.     The Plaintiff brings their state claims against Defendants CPD and SCDPS pursuant to

2

the South Carolina Tort Claims Act S.C. Code Ann. §15-78-10 et seq. and §15-5-90 et seq. In the alternative, if the conduct of ADAMS, HEWITT and DAVIS is found to have been outside the course and scope of their employment and/or official duties, the Plaintiff is asserting state law causes of action against those Defendants in their individual capacities.

8.    That Plaintiff brings all causes of action brought in this complaint pursuant to South Carolina Code § 15-51-10, Civil Action for Wrongful Act Causing Death. Plaintiff brings this action on behalf of the Estate and the beneficiaries of the Estate of DAVID W. WATSON, deceased.

## FACTUAL ALLEGATIONS

9.    On or about June 2, 2012, at approximately 10:30 p.m., WATSON was sitting in his parked work car in the Bojangles' parking lot located at 1202 West Boulevard, Chesterfield, South Carolina, for the purposes of using the free Wi-Fi available at Bojangles.

10.    At approximately 10:49 p.m., Chesterfield E-911 Dispatch received a telephone call from Defendant DAVIS. In that call, after asking where Defendant ADAMS is, Defendant DAVIS informs 911 dispatch that his grandmother, who he claims is sitting in Bojangles, has just called him to report that a white car with tinted windows has come up and parked, no one can see in to the car and that they want someone to come check it out.

11.    At approximately 10:51 p.m., 911 Dispatch contacted Defendant ADAMS and relayed information concerning the call described in paragraph ten (10) above.

12.    Subsequent to the events described above, Defendant ADAMS responded towards the Bojangles. Defendant ADAMS passed a "white vehicle matching the description"

3

turning east on to Main Street. Defendant ADAMS turned his vehicle around to pursue this vehicle. As Defendant ADAMS came up behind the vehicle, the vehicle slowed, engaged the right-turn signal, and executed a right-turn in to a private drive at 911 W. Main Street.

13. The vehicle described in paragraph twelve (12) was WATSON's vehicle and he was returning to his residence. Defendant ADAMS followed the vehicle, proceeding to park behind WATSON in his yard.

14. Defendant ADAMS reported that he "noticed it was David Watson an investigator with Cheraw PD" upon WATSON opening his car door to exit the vehicle. Defendant ADAMS reported that WATSON "grabbed the door for support and was very unsteady on his feet." Defendant ADAMS reported WATSON closing the door to his car. Defendant ADAMS reported that he "noticed that Watson had slurred speech and there was an odor of alcohol coming from the vehicle as well as from his person." Defendant ADAMS reported that WATSON "admitted that he had been drinking earlier that day."

15. Subsequent to the events described in paragraph fourteen (14), Defendant ADAMS continues to report that "Trooper Davis from SCHP had pulled in behind RO for assistance and began to walk up during the time of Watson exiting the vehicle." Defendant ADAMS reported that he turned his attention away from WATSON to respond to a telephone call from Defendant HEWITT and that when his attention returned, WATSON was entering his residence. Defendant ADAMS reported that WATSON locked his door and would not respond or unlock the door.

16. Subsequent to the events described above, Defendant ADAMS requested Defendant HEWITT to come and assist. Defendant ADAMS reported that a search warrant was

4

prepared and that he took said warrant to Judge Davis' residence to have it signed. Defendant ADAMS reported that upon returning to the WATSON's residence, Defendant HEWITT and Cheraw Chief of Police Keith Thomas "had talked Watson into coming out." Defendant ADAMS reported entering WATSON's residence, advising WATSON that he was under arrest for "Driving Under the Influence of Alcohol," placing WATSON in handcuffs and leading WATSON out to the patrol car. Defendant ADAMS reported offering WATSON field sobriety tests, with WATSON refusing, before placing WATSON in the patrol car.

17.    Subsequent to the events described above, Defendant ADAMS transported WATSON to the county jail, where WATSON was booked for a charge of DUI.

18.    Subsequent to the events described above, WATSON requested an administration hearing to challenge the State's suspension of his driver's license that resulted from the DUI charge described above. That administrative hearing took place on August 14, 2012, before Administrative Hearing Officer Phil Addington. Defendant ADAMS appeared at that administrative hearing on behalf of the State.

19.    At the administrative hearing described in paragraph eighteen (18), Defendant ADAMS was duly sworn by the hearing officer and asked if there was any testimony he wished to enter in to the record. Defendant ADAMS proceeded to read his incident report (see Exhibit A) verbatim, as his sworn testimony. During Defendant ADAMS "testimony," when he got past the point of his incident report describing Defendant DAVIS walking up, WATSON's counsel interjected. WATSON's counsel explained that up until the point Defendant ADAMS made the stop was the only relevant testimony required since WATSON was solely challenging the probable cause for the traffic stop at that time.

5

WATSON's counsel waived on the record the right to challenge any other issue for the purposes of the administrative hearing. Defendant ADAMS was offered the opportunity to rest his testimony at that time, but informed the hearing officer that he wished to continue reading his report in as testimony. Defendant ADAMS so proceeded, reading his entire report in to the record as his sworn testimony.

20.    After concluding the verbatim reading of his report as sworn testimony, Defendant ADAMS next offered in to evidence testimony based off of the Chesterfield E-911 CAD Report. Defendant ADAMS provided sworn testimony concerning that report testifying that:

> They called me, which is 7-3, said there was suspicious vehicle. White car, four door, with tinted windows, in the parking lot with the lights off, going around in circles, forward, backward. And at this time, it's not wrote on the CAD report, but -- Bojangles is closing, at this time of night. There was a few older people in there eating and getting ready to leave -- plus the women that worked there. So they felt threatened by someone in the parking lot they didn't know. This car that he was driving, is not a marked police car. Uh -- tinted windows -- uh -- regular South Carolina license tag. Nobody knew who it was at that time.
>
> While I was responding, the car matching the description that they gave me was pulling out the back of the parking lot on to Main Street. So I pulled in behind it. This is only a quarter mile, approximately, from his residence, so we did not have much of a time. By the time I speeded up to catch up to him, he's turning in the driveway, so I hit the blue lights and pull in behind him.
>
> Uh -- this is not a typical DUI stop, where you watch the fella for two miles swerving and weaving. We had no time for that. We were strictly responding on a suspicious vehicle call. Which we get several of and we respond to everyone of them in the same manner. (See *Exhibit A*, transcript of Administrative Hearing held before Hearing Officer Phillip T. Addington, August 14, 2012, P. 8, L. 20 – P. 9, L. 20.)

21.    Subsequent to the testimony described above, Defendant ADAMS sought to enter in to

the record a copy of a written statement produced by Defendant DAVIS. WATSON's counsel objected to said statement on the basis of it being hearsay and the hearing officer did not allow the statement in.

22. The written statement described above is a written statement WATSON is informed and believes was produced and signed by Defendant DAVIS. That statement is on South Carolina Department of Public Safety/S.C. Highway Patrol letterhead.

23. Upon the events described above, Defendant ADAMS rested his case and WATSON's counsel began cross-examination of Defendant ADAMS. During cross-examination, Defendant ADAMS made the following admissions on the record:

  a. That part of the training he had received at the Academy was how to create reports;

  b. That reports have to be accurate;

  c. That reports have to be truthful;

  d. That reports have to be complete;

  e. That the report he has just read in to evidence was accurate and truthful;

  f. That he observed no bad driving by WATSON;

  g. That WATSON's driving in no way indicated impairment;

  h. That WATSON's only "crime" was "being a suspicious vehicle in the parking lot," and that "no where" in the law does it say it is a crime to be a suspicious vehicle;

  i. That the call in the case did not allege any criminal activity, although Defendant ADAMS testified that the call alleged "people were scared";

  j. Defendant ADAMS testified that WATSON was not "parked" in the

7

parking lot, rather "he was riding around in circles, and pulling forward
and backwards with his lights off in a suspicious manner";

k.  That he stopped WATSON based entirely on the call;

l.  That he knew who WATSON was, but that he did not know who was in
the white car until they started pulling in to WATSON's residence;

m.  That he called Defendant HEWITT as WATSON was pulling in to his
residence.

(See *Exhibit A*, P. 10 – 16.)

24.  Subsequent to WATSON's counsel resting his cross-examination of Defendant ADAMS,
Defendant ADAMS offered closing remarks wherein he stated that any suspicious car
call in to Chesterfield would lead to that car being stopped. Defendant ADAMS testified
that even if he thinks he knows who is in the car, he would stop the car, ID the person and
find out what they were doing. Defendant ADAMS stated this "is our standard practice
and that's the way it will be done from now on." Defendant ADAMS further stated this
applied to any suspicious car call for vehicles at businesses or on private property. (See
*Exhibit A*, P. 18, L. 9 – 12.)

25.  Defendant ADAMS asked to make remarks after WATSON's counsel offered his closing
argument. The hearing officer allowed him to do so. In those remarks, Defendant
ADAMS claimed WATSON's counsel was:

> ...lumping the DUI in with the stop. The stop was just for ID.
> And in the state of South Carolina, we as police officers have the
> right to stop anybody on the street for an ID or ID anybody who is
> in a suspicious manner. Then when the smell of alcohol come
> from the vehicle it changed to a DUI stop. (See *Exhibit A*, P. 21,
> L. 5 – 10.)

8

26.     Subsequent to the events described above, the State of South Carolina rescinded the
        suspension of WATSON's driver's license via an order issued August 15, 2012. In that
        order, the hearing officer concluded as a matter of law that the State had not met its
        burden to sustain the suspension.    Specifically, the hearing officer found that the
        testimony of Defendant ADAMS was that WATSON "was stopped only for being a
        suspicious vehicle." The hearing officer noted that there was no testimony concerning
        any identification of the car other than it being white. The hearing officer specifically
        noted that it was unclear from the evidence the State presented whether or not
        WATSON's vehicle was the subject of the telephone call. The hearing officer also noted
        that other than the allegations that the call had originated from someone inside the
        Bojangles, the person alleged to have made the call was anonymous. The hearing officer
        specifically found that because Defendant ADAMS did not know who had placed the call
        and could not therefore verify the reliability of the caller, Defendant ADAMS was
        required to corroborate the information before there was reasonable suspicion to justify
        the vehicle stop.   The hearing officer found no such testimony of corroboration and
        therefore no probable cause to arrest WATSON for driving under the influence.

27.     WATSON was terminated from his job as an investigator with the Cheraw Police
        Department within 24-hours of his arrest.

28.     Subsequent to the events described above, WATSON continued to investigate his case
        and prepare his defense. In the course of that investigation and preparation, WATSON
        obtained the 911 dispatch calls. Those calls document the following:

        a.      The "anonymous" telephone call that was placed to 911 reporting the alleged
                suspicious white vehicle was actually placed by Defendant DAVIS.     The

                                                9

transcript of that call reads as follows:

| | |
|---|---|
| 911 Operator: | Emergency services. |
| DAVIS: | Hey. This is Leslie. |
| 911 Operator: | Hey. |
| DAVIS: | Uh – where's Robby. |
| 911 Operator: | I don't know. Why? |
| DAVIS: | My grandmother just called me. She's sitting in Bojangles. There's a white car, with tinted windows, come up and just parking outside. Nobody can see in it and they just want somebody to come by and check it out. |
| 911 Operator: | It's parked outside? |
| DAVIS: | Yeah in the gravel parking lot -- it's just been backing up around an eighteen wheeler out there. |
| 911 Operator: | A white car? |
| DAVIS: | It's a white Ford something, little four door car with tinted windows. |
| 911 Operator: | She working or she just in there? |
| DAVIS: | She's in there and they just can't figure out what they're doing. |
| 911 Operator: | Okay.  What's her name -- Or I'll just put it under yours. |
| DAVIS: | Okay. |
| 911 Operator: | Okay.  I'll send him around there. |

(See *Exhibit B*, transcript of Dispatch Emergency Services telephone call of June 2, 2012 at 22:47:55.)

b.    Subsequent to the call described in paragraph above, the 911 operator called

Defendant ADAMS.  The transcript of that call reads as follows:

| | |
|---|---|
| ADAMS: | Hello? |
| 911 Operator: | Hey. |
| ADAMS: | Hey. |
| 911 Operator: | Leslie Davis just called me and said that his Grandma's in Bojangles. And there's a white car, four door car, with tinted windows, that's out there in the gravel parking lot part. He said it keeps backing up and |

10

|               |                                                                                          |
|---------------|------------------------------------------------------------------------------------------|
|               | going forward and backing up and going forward, been out there for a long time they don't know what its doing. They want someone to go out there and check it. |
| ADAMS:        | Okay.                                                                                    |
| 911 Operator: | Okay.                                                                                    |
| ADAMS:        | And Leslie called?                                                                       |
| 911 Operator: | Yeah, his grandma called him. She's in -- she's in there, but she called him.           |
| ADAMS:        | Okay.                                                                                    |
| 911 Operator: | Okay.                                                                                    |
| ADAMS:        | Allright                                                                                 |
| 911 Operator: | Uh-huh.                                                                                  |

(See *Exhibit C*, transcript of Dispatch Emergency Services telephone call of June 2, 2012 at 22:49:51.)

29.    Upon learning that the actual call to 911 had originated from Defendant DAVIS, WATSON issued a subpoena decus tecum requesting, among other items, the phone records for Defendant DAVIS' mobile phone, as well as the name, address and telephone number for Defendant DAVIS' grandmother mentioned in the 911 call. That subpoena was served on or about June 28, 2012.

30.    Subsequent to the events described in paragraph twenty-nine (29), Defendant DAVIS provided a response to the subpoena described above. Noticeably absent from that response, was any of the information sought concerning the identity of Defendant DAVIS' grandmother. Due to the absence of any response on that subject, WATSON investigated further the alleged telephone call Defendant DAVIS received from his grandmother. That investigation revealed the following:

       a.    Prior to Defendant DAVIS' call to 911 and the phone calls immediately following, Defendant DAVIS's phone records show only calls between Defendant

11

DAVIS and:

    i.       Defendant ADAMS, for 4 minutes at 10:42 pm;

    ii.      Defendant HEWITT, for 1 minute at 10:45 pm;

    iii.     Chesterfield Dispatch, for 2 minutes at 10:47 pm (WATSON is informed and believes this call to be Defendant DAVIS' call to 911);

    iv.     Defendant HEWITT, for 5 minutes at 10:49 pm;

    v.      Defendant HEWITT, for 1 minute at 11:03 pm.

    vi.     Cheraw Police Department, for 3 minutes at 11:04 pm.

31.    Upon seeing that the calls immediately preceding Defendant DAVIS' call to 911 were with Defendant ADAMS and Defendant HEWITT, WATSON further investigated Defendant DAVIS' claim to having received a telephone call from his "grandmother." The results of that investigation revealed that both Defendant DAVIS' paternal and maternal grandmothers appear to be deceased. WATSON bases this allegation upon the following:

    a.     An online engagement announcement for Defendant DAVIS and his wife from the Progressive Journal, dated May 9, 2011 at 4:18 pm, which describes Defendant DAVIS as "the grandson of the late Mr. and Mrs. James Davis of Chesterfield, and the late Mr. and Mrs. Robert Sutton of Ruby" (See *Exhibit D*);

    b.     An online obituary from The Cheraw Chronicle, memorializing the September 3, 2009 death of Margie Gulledge Sutton and listing "Leslie Davis of Chesterfield, S.C." as a surviving grandchild (See *Exhibit E*);

c.    An online obituary from The Cheraw Chronicle, memorializing the October 8, 2008 death of Esther Jones Davis and listing "Leslie Davis of Chesterfield" as a surviving grandchild (See *Exhibit F*).

32.    As part of his investigation, WATSON discovered that on the night of July 2, 2012, Defendant HEWITT contacted WATSON's estranged wife, Mary Florence Watson. Defendant HEWITT apparently contacted her asking her to contact WATSON and attempt to get him to exit his house. Mary Florence contacted WATSON by telephone and he said he would not come out of his residence. She relayed that information back to Defendant HEWITT who informed her that if WATSON would not come out, they would have to go in. Mary Florence informed Defendant HEWITT that she had a key to the residence and asked Defendant HEWITT to please not break down the doors, expressing concern for the effect that action would have on WATSON.

33.    Subsequent to the telephone conversation described in paragraph thirty-two (32), Defendant HEWITT came to Mary Florence Watson's residence and obtained the key to WATSON's residence. Defendant HEWITT returned said key later that same evening.

34.    On or about August 29, 2012, WATSON committed suicide. In doing so, WATSON left correspondence expressing his last wishes and explaining that he was taking his life due to the loss of his career and his wife. Specifically, WATSON noted "I loved being a Detective but I know I will never be one again."

35.    The criminal charges against WATSON were *nolle prossed* on or about September 19, 2012.

### FOR A FIRST CAUSE OF ACTION
Against Defendant CPD

36.    The Plaintiff incorporates by reference all previous allegations of fact and law as if repeated herein.

37.    The Defendant CPD is vicariously liable for the acts and omissions of Defendants ADAMS and HEWITT acting within the course and scope of their employment.

38.    That as a direct and proximate result of the Defendant CPD's willful, wanton and grossly negligent acts and omissions, the Plaintiff is informed and believes that the Plaintiff's decedent suffered mental, emotional and physical harm, special damages, proximately caused by:

   a.    The acts and omissions of Defendant CPD, by show of force and physically detaining the Plaintiff without reasonable suspicion to seize him violated the Plaintiff's fourth amendment rights;

   b.    The acts and omissions of Defendant CPD, in executing an unlawful stop against the Plaintiff and in subsequently arresting WATSON based off of that unlawful stop without probable cause violated WATSON's fourth amendment rights to be free from unreasonable seizures;

   c.    The acts and omissions of Defendant CPD of intentionally restraining WATSON's movement without lawful authority constituting the tort of false imprisonment;

   d.    The acts and omissions of Defendant CPD of intentionally stopping WATSON unlawfully without probable cause and for subsequently arresting WATSON without probable cause constitute the tort of false arrest;

   e.    The acts and omissions of Defendant CPD in conspiring with others for

14

the purposes of injuring WATSON. For the purposes of this cause of action, "others" is meant to include, but not be limited to Defendant SCDPS, Defendant ADAMS, Defendant HEWITT and Defendant DAVIS;

f.    The acts and omissions of Defendant CPD, as described in paragraphs ten (10) through thirty-five (35), of maliciously prosecuting WATSON by instituting criminal proceedings against WATSON despite knowing they lacked probable cause for the initial traffic stop and subsequent search warrant and arrest; and

g.    The acts and omissions of Defendant CPD, as described in paragraphs ten (10) through thirty-five (35), of abusing process by instituting criminal and administrative proceedings against WATSON despite knowing they lacked probable cause for the initial traffic stop and subsequent search warrant and arrest.

39.    That the Plaintiff is informed and believes that the acts and omissions described above constitute wrongful conduct and/or violations of federal and state law.

40.    That the Plaintiff's intestate, David W. Watson, came to his untimely death as a consequence of the alleged wrongful conduct documented above. Specifically, but not limited to that conducted listed in paragraph thirty-eight (38).

41.    That Defendant CPD's negligence and/or recklessness, willfulness and wantonness, in one or more of the alleged incidents of wrongful conduct as described above, was the proximate cause of the death of the Plaintiff's intestate.

15

42.   As a direct and proximate result of the aforesaid acts and omissions of the Defendant CPD, the Plaintiff's decedent suffered substantial mental, emotional and physical injuries, conscious pain and suffering, financial earning loss, employment benefit loss, death and funeral expenses.

43.   That as a result of the Plaintiff's decedent's death, the beneficiaries have suffered pecuniary loss, mental shock, suffering, extreme emotional anguish, wounded feelings, grief and sorrow, the loss of care, comfort, companionship, and society of the decedent, as well as the loss of his services and support. In addition, the decedent's beneficiaries have suffered economic loss in the form of funeral expenses on behalf of the decedent.

### FOR A SECOND CAUSE OF ACTION
Against Defendant SCDPS

44.   The Plaintiff incorporates by reference all previous allegations of fact and law as if repeated herein.

45.   The Defendant SCDPS is vicariously liable for the acts and omissions of Defendants ADAMS and HEWITT acting within the course and scope of their employment.

46.   That as a direct and proximate result of the Defendant SCDPS's willful, wanton and grossly negligent acts and omissions, the Plaintiff is informed and believes that the Plaintiff's decedent suffered mental, emotional and physical harm, special damages, proximately caused by:

   a.   The acts and omissions of Defendant SCDPS, by show of force and physically detaining the Plaintiff without reasonable suspicion to seize him violated the Plaintiff's fourth amendment rights;

   b.   The acts and omissions of Defendant SCDPS, in executing an unlawful

16

stop against the Plaintiff and in subsequently arresting WATSON based off of that unlawful stop without probable cause violated WATSON's fourth amendment rights to be free from unreasonable seizures;

c.    The acts and omissions of Defendant SCDPS of intentionally restraining WATSON's movement without lawful authority constituting the tort of false imprisonment;

d.    The acts and omissions of Defendant SCDPS of intentionally stopping WATSON unlawfully without probable cause and for subsequently arresting WATSON without probable cause constitute the tort of false arrest;

e.    The acts and omissions of Defendant SCDPS in conspiring with others for the purposes of injuring WATSON. For the purposes of this cause of action, "others" is meant to include, but not be limited to Defendant CPD, Defendant ADAMS, Defendant HEWITT and Defendant DAVIS;

f.    The acts and omissions of Defendant SCDPS, as described in paragraphs ten (10) through thirty-five (35), of maliciously prosecuting WATSON by instituting criminal proceedings against WATSON despite knowing they lacked probable cause for the initial traffic stop and subsequent search warrant and arrest; and

g.    The acts and omissions of Defendant SCDPS, as described in paragraphs ten (10) through thirty-five (35), of abusing process by instituting criminal and administrative proceedings against WATSON despite knowing they lacked probable cause for the initial traffic stop and

17

subsequent search warrant and arrest.

47.    That the Plaintiff is informed and believes that the acts and omissions described above constitute wrongful conduct and/or violations of federal and state law.

48.    That the Plaintiff's intestate, David W. Watson, came to his untimely death as a consequence of the alleged wrongful conduct documented above. Specifically, but not limited to that conducted listed in paragraph forty-six (46).

49.    That Defendant SCDPS's negligence and/or recklessness, willfulness and wantonness, in one or more of the alleged incidents of wrongful conduct as described above, was the proximate cause of the death of the Plaintiff's intestate.

50.    As a direct and proximate result of the aforesaid acts and omissions of the Defendant SCDPS, the Plaintiff's decedent suffered substantial mental, emotional and physical injuries, conscious pain and suffering, financial earning loss, employment benefit loss, death and funeral expenses.

51.    That as a result of the Plaintiff's decedent's death, the beneficiaries have suffered pecuniary loss, mental shock, suffering, extreme emotional anguish, wounded feelings, grief and sorrow, the loss of care, comfort, companionship, and society of the decedent, as well as the loss of his services and support. In addition, the decedent's beneficiaries have suffered economic loss in the form of funeral expenses on behalf of the decedent.

## FOR A THIRD CAUSE OF ACTION
Against Defendant ADAMS (In the Alternative)

52.    The Plaintiff incorporates by reference all previous allegations of fact and law as if repeated herein.

53.   In the alternative, if Defendant ADAMS is found to have acted outside the course and scope of his employment, the Plaintiff asserts the following:

54.   That as a direct and proximate result of the Defendant ADAMS' willful, wanton and grossly negligent acts and omissions, the Plaintiff is informed and believes that the Plaintiff's decedent suffered mental, emotional and physical harm, special damages, proximately caused by:

   a.   The acts and omissions of Defendant ADAMS, by show of force and physically detaining the Plaintiff without reasonable suspicion to seize him violated the Plaintiff's fourth amendment rights;

   b.   The acts and omissions of Defendant ADAMS, in executing an unlawful stop against the Plaintiff and in subsequently arresting WATSON based off of that unlawful stop without probable cause violated WATSON's fourth amendment rights to be free from unreasonable seizures;

   c.   The acts and omissions of Defendant ADAMS of intentionally restraining WATSON's movement without lawful authority constituting the tort of false imprisonment;

   d.   The acts and omissions of Defendant ADAMS of intentionally stopping WATSON unlawfully without probable cause constitute the tort of false arrest;

   e.   The acts and omissions of Defendant ADAMS in conspiring with others for the purposes of injuring WATSON. For the purposes of this cause of action, "others" is meant to include, but not be limited to Defendant CPD, Defendant SCDPS, Defendant HEWITT and Defendant DAVIS;

f.    The acts and omissions of Defendant ADAMS, as described in paragraphs ten (10) through thirty-five (35), of maliciously prosecuting WATSON by instituting criminal proceedings against WATSON despite knowing he lacked probable cause for the initial traffic stop and subsequent search warrant and arrest; and

g.    The acts and omissions of Defendant ADAMS, as described in paragraphs ten (10) through thirty-five (35), of abusing process by instituting criminal and administrative proceedings against WATSON despite knowing he lacked probable cause for the initial traffic stop and subsequent search warrant and arrest.

55.    That the Plaintiff is informed and believes that the acts and omissions described above constitute wrongful conduct and/or violations of federal and state law.

56.    That the Plaintiff's intestate, David W. Watson, came to his untimely death as a consequence of the alleged wrongful conduct documented above.  Specifically, but not limited to that conducted listed in paragraph fifty-four (54).

57.    That Defendant ADAMS' negligence and/or recklessness, willfulness and wantonness, in one or more of the alleged incidents of wrongful conduct as described above, was the proximate cause of the death of the Plaintiff's intestate.

58.    As a direct and proximate result of the aforesaid acts and omissions of the Defendant ADAMS, the Plaintiff's decedent suffered substantial mental, emotional and physical injuries, conscious pain and suffering, financial earning loss, employment benefit loss, death and funeral expenses.

59.    That as a result of the Plaintiff's decedent's death, the beneficiaries have suffered pecuniary loss, mental shock, suffering, extreme emotional anguish, wounded feelings, grief and sorrow, the loss of care, comfort, companionship, and society of the decedent, as well as the loss of his services and support. In addition, the decedent's beneficiaries have suffered economic loss in the form of funeral expenses on behalf of the decedent.

**FOR A FOURTH CAUSE OF ACTION**
Against Defendant HEWITT (In the Alternative)

60.    The Plaintiff incorporates by reference all previous allegations of fact and law as if repeated herein.

61.    In the alternative, if Defendant HEWITT is found to have acted outside the course and scope of his employment, the Plaintiff asserts the following:

62.    That as a direct and proximate result of the Defendant HEWITT's willful, wanton and grossly negligent acts and omissions, the Plaintiff is informed and believes that the Plaintiff's decedent suffered mental, emotional and physical harm, special damages, proximately caused by:

   a.    The acts and omissions of Defendant HEWITT, by show of force and physically detaining the Plaintiff without reasonable suspicion to seize him violated the Plaintiff's fourth amendment rights;

   b.    The acts and omissions of Defendant HEWITT, in executing an unlawful stop against the Plaintiff and in subsequently arresting WATSON based off of that unlawful stop without probable cause violated WATSON's fourth amendment rights to be free from unreasonable seizures;

   c.    The acts and omissions of Defendant HEWITT of intentionally

21

restraining WATSON's movement without lawful authority constituting the tort of false imprisonment;

d.  The acts and omissions of Defendant HEWITT of intentionally stopping WATSON unlawfully without probable cause constitute the tort of false arrest;

e.  The acts and omissions of Defendant HEWITT in conspiring with others for the purposes of injuring WATSON. For the purposes of this cause of action, "others" is meant to include, but not be limited to Defendant CPD, Defendant SCDPS, Defendant ADAMS and Defendant DAVIS;

f.  The acts and omissions of Defendant HEWITT, as described in paragraphs ten (10) through thirty-five (35), of maliciously prosecuting WATSON by instituting criminal proceedings against WATSON despite knowing he lacked probable cause for the initial traffic stop and subsequent search warrant and arrest; and

g.  The acts and omissions of Defendant HEWITT, as described in paragraphs ten (10) through thirty-five (35), of abusing process by instituting criminal and administrative proceedings against WATSON despite knowing he lacked probable cause for the initial traffic stop and subsequent search warrant and arrest.

63.  That the Plaintiff is informed and believes that the acts and omissions described above constitute wrongful conduct and/or violations of federal and state law.

64.    That the Plaintiff's intestate, David W. Watson, came to his untimely death as a consequence of the alleged wrongful conduct documented above. Specifically, but not limited to that conducted listed in paragraph sixty-two (62).

65.    That Defendant HEWITT's negligence and/or recklessness, willfulness and wantonness, in one or more of the alleged incidents of wrongful conduct as described above, was the proximate cause of the death of the Plaintiff's intestate.

66.    As a direct and proximate result of the aforesaid acts and omissions of the Defendant HEWITT, the Plaintiff's decedent suffered substantial mental, emotional and physical injuries, conscious pain and suffering, financial earning loss, employment benefit loss, death and funeral expenses.

67.    That as a result of the Plaintiff's decedent's death, the beneficiaries have suffered pecuniary loss, mental shock, suffering, extreme emotional anguish, wounded feelings, grief and sorrow, the loss of care, comfort, companionship, and society of the decedent, as well as the loss of his services and support. In addition, the decedent's beneficiaries have suffered economic loss in the form of funeral expenses on behalf of the decedent.

**FOR A FIFTH CAUSE OF ACTION**
Against Defendant DAVIS (In the Alternative)

68.    The Plaintiff incorporates by reference all previous allegations of fact and law as if repeated herein.

69.    In the alternative, if Defendant DAVIS is found to have acted outside the course and scope of his employment, the Plaintiff asserts the following:

70.    That as a direct and proximate result of the Defendant DAVIS' willful, wanton and grossly negligent acts and omissions, the Plaintiff is informed and believes that the

23

Plaintiff's decedent suffered mental, emotional and physical harm, special damages, proximately caused by:

a.      The acts and omissions of Defendant DAVIS, by show of force and physically detaining the Plaintiff without reasonable suspicion to seize him violated the Plaintiff's fourth amendment rights;

b.      The acts and omissions of Defendant DAVIS, in executing an unlawful stop against the Plaintiff and in subsequently arresting WATSON based off of that unlawful stop without probable cause violated WATSON's fourth amendment rights to be free from unreasonable seizures;

c.      The acts and omissions of Defendant DAVIS of intentionally restraining WATSON's movement without lawful authority constituting the tort of false imprisonment;

d.      The acts and omissions of Defendant DAVIS of intentionally stopping WATSON unlawfully without probable cause constitute the tort of false arrest;

e.      The acts and omissions of Defendant DAVIS in conspiring with others for the purposes of injuring WATSON. For the purposes of this cause of action, "others" is meant to include, but not be limited to Defendant CPD, Defendant SCDPS, Defendant ADAMS and Defendant HEWITT;

f.      The acts and omissions of Defendant DAVIS, as described in paragraphs ten (10) through thirty-five (35), of maliciously prosecuting WATSON by instituting criminal proceedings against WATSON despite knowing he lacked probable cause for the initial traffic stop and subsequent search

24

warrant and arrest; and

g.    The acts and omissions of Defendant DAVIS, as described in paragraphs ten (10) through thirty-five (35), of abusing process by instituting criminal and administrative proceedings against WATSON despite knowing he lacked probable cause for the initial traffic stop and subsequent search warrant and arrest.

71.    That the Plaintiff is informed and believes that the acts and omissions described above constitute wrongful conduct and/or violations of federal and state law.

72.    That the Plaintiff's intestate, David W. Watson, came to his untimely death as a consequence of the alleged wrongful conduct documented above. Specifically, but not limited to that conducted listed in paragraph seventy-one (71).

73.    That Defendant DAVIS' negligence and/or recklessness, willfulness and wantonness, in one or more of the alleged incidents of wrongful conduct as described above, was the proximate cause of the death of the Plaintiff's intestate.

74.    As a direct and proximate result of the aforesaid acts and omissions of the Defendant DAVIS, the Plaintiff's decedent suffered substantial mental, emotional and physical injuries, conscious pain and suffering, financial earning loss, employment benefit loss, death and funeral expenses.

75.    That as a result of the Plaintiff's decedent's death, the beneficiaries have suffered pecuniary loss, mental shock, suffering, extreme emotional anguish, wounded feelings, grief and sorrow, the loss of care, comfort, companionship, and society of the decedent, as well as the loss of his services and support. In addition, the decedent's beneficiaries have suffered economic loss in the form of funeral expenses on behalf of the decedent.

**DAMAGES**

76. That as to Defendants CPD and SCDPS, the Plaintiff is informed and believes that they

    are entitled to actual and consequential damages, damages pursuant to S. C. Code § 15-

    51-40 and such other relief as the Court deems just and proper.

77. That as to Defendants ADAMS, HEWITT and DAVIS, the Plaintiff is informed and

    believes that they are entitled to actual, consequential and punitive damages, damages

    pursuant to S. C. Code § 15-51-40 and such other relief as the Court deems just and

    proper.

**PRAYER FOR RELIEF**

WHEREFORE having fully set forth the grounds of their complaint Plaintiff asks this court

to award compensatory and punitive damages in an appropriate amount, attorney fees and costs

pursuant to 42 U.S.C. §1988, and such other relief as this court deems just and proper.

Patrick J. McLaughlin, Esquire
Wukela Law Firm
P.O. Box 13057
Florence, South Carolina 29504-3057
Telephone: 843-669-5634
Facsimile: 843-669-5151
Email: patrick@wukelalaw.com
Attorney for the Plaintiff

Franklin B. Joyner, Jr.
Joyner Law Firm
P.O. Box 1434
Cheraw, SC 29520
Telephone: 843-253-5316
Facsimile: 843-2536-5318
Email: jrjoynerlaw@gmail.com
Attorney for the Plaintiff

November 2 , 2012

26

# Exhibit A

STATE OF SOUTH CAROLINA

OFFICE OF MOTOR VEHICLE HEARINGS

Chesterfield Police ) Docket No. 12-OMVH-01-3161-CC
Department )
and ) DL# 007228412
South Carolina Department )
of Motor Vehicles, )
)
                Petitioner, )
)
vs. )
)
David Warren Watson, )
)
                Respondent. )

Transcript of Record of Hearing held before

Hearing Officer Phillip T. Addington on August 14, 2012 at

Kershaw County Court House, 1121 Broad Street, Grand Jury

Room, Camden, South Carolina. Hearing scheduled to begin

at 9:00 A.M.

Transcript prepared by Laura W. Little, Notary

Public in and for the State of South Carolina.

APPEARANCES OF COUNSEL:

Franklin B. Joyner, Jr., Esquire
Attorney At Law
Post Office Box 1434
Cheraw, South Carolina  29520

---

Page 2

1    ADMINISTRATIVE HEARING OFFICER ADDINGTON("AHO"):

2    My name is Phil Addington, and I've been appointed by

3    the South Carolina Administrative Law Court to preside

4    at this contested case. The entire proceedings are

5    being tape recorded for Departmental reference and are a

6    matter of public record. I turn you now to the issues

7    that are mandated by statute. Are there any issues

8    being contested or stipulated to?

9        MR. JOYNER: Yes. No. Your Honor, the issues that

10   we're going to contest is his probable cause to make the

11   stop.

12       HEARING OFFICER: If you'd stand for me please,

13   sir. Give for me your full name, your work address and

14   your position as it's related to this matter?

15       CORPORAL ADAMS: Robert Allen Adams, Corporal with

16   the Chesterfield Police Department. I'm the arresting

17   officer for Mr. Watson's DUI.

18       HEARING OFFICER: And also the Datamaster operator,

19   am I correct?

20       CORPORAL ADAMS: Okay.

21       HEARING OFFICER: Okay. If you'll raise your right

22   hand for me? Do you solemnly swear the testimony you're

23   about to give in this matter will be the truth, the

24   whole truth and nothing but the truth?

25       CORPORAL ADAMS: Yes, sir.

---

Page 3

1        HEARING OFFICER: Okay. You may be seated. All

2    issues have been contested here today and y'all can just

3    remain seated. Do you have testimony that you'd like to

4    enter here today pertaining to those contested issues?

5        CORPORAL ADAMS: The main purpose of his contesting

6    it is the probable cause for the stop. If I may, I'll

7    read my Incident Report which covers this, and then I

8    have a, a CAD Report from Chesterfield County 9-1-1

9    Service where they dispatched me to the area for a

10   suspicious vehicle and that was the probable cause for

11   the stop, but I'll just read my report. "RO," which is

12   me, the officer, "received a call from dispatch

13   regarding a suspicious vehicle in the Bojangles parking

14   lot. The vehicle was described as a white car and had

15   tinted windows. The vehicle was running and had its

16   lights off and backing up in circles, pulling up

17   parallel with the building in the truck section of the

18   parking lot. RO was in the neighborhood on the north

19   side of town doing property checks. RO responded from

20   Curtis Road onto Tammy Street. While on Tammy Street,

21   RO noticed a white vehicle matching the description

22   leaving the Bojangles parking lot turning east on Main

23   Street. RO stopped at the stop sign at Tammy Street and

24   then proceeded east on Main. RO intended to perform a

25   traffic stop to ID the subject and inquire why the

---

Page 4

1    subject was in the parking lot at this time of night.

2    As RO got close to subject's vehicle, it slowed and give

3    a turn signal to turn right into the driveway at 911

4    West Main. RO turned on the blue lights, followed the

5    vehicle into the rear of the house. RO exited the

6    patrol vehicle, approached the white car. The driver

7    opened the door, exited and RO noticed it was David

8    Watson, investigator with Cheraw Police Department. RO

9    then noticed that Watson was wearing shorts, t-shirt and

10   no shoes on. RO watched as he got out of the vehicle.

11   He grabbed the door for support and was very unsteady on

12   his feet. Watson closed the door of his vehicle which

13   was an unmarked Cheraw Police Department vehicle.

14   Watson then leaned back on the vehicle while RO talked

15   to him. RO noticed Watson had slurred speech and there

16   was an odor of alcohol coming from his vehicle, as well

17   as his person. Watson admitted that he had been

18   drinking earlier that day and suggested that officers

19   'do not do this.' Trooper Davis from the South Carolina

20   Highway Patrol had pulled in behind RO for assistance

21   and began to walk up during the time of Watson exiting

22   the vehicle. RO told Watson to wait at the vehicle for

23   a moment. Mr. Watson---

24       MR. JOYNER: Judge, if I could, I'm, I'm sorry to

25   interrupt you. I would just say up to the point where

Transcript of Record of Hearing    Multi-Page™    August 14, 2012

Page 5

1  he made the stop is the only thing we're going to
2  contest.  I mean, I don't necessarily think we need to
3  waste the---
4          CORPORAL DAVIS:  Okay.
5          MR. JOYNER:  ---Court's time with the (inaudible)
6  details.
7          CORPORAL DAVIS:  I can, I can stop there.
8          HEARING OFFICER:  Okay.
9          CORPORAL DAVIS:  That covers the reason for the
10  stop.
11         HEARING OFFICER:  Okay.  But all other issues are
12  being contested also, other than the probable cause.  Up
13  to that point, you're okay?
14         MR. JOYNER:  Judge, I can waive those issues.  I, I
15  -- the probable cause is, is certainly strong enough.
16         HEARING OFFICER:  So the second and third issues
17  would be stipulated to?
18         MR. JOYNER:  That's right.
19         HEARING OFFICER:  Okay.  And the first issue is
20  contested.
21         MR. JOYNER:  Okay.
22         HEARING OFFICER:  And you're basically up to this
23  point no more testimony needs to be entered in as to
24  what occurred?
25         MR. JOYNER:  Yeah.  I mean, Your Honor, if he, if

Laura Little Reporting Service
843-393-6466

---

Transcript of Record of Hearing    Multi-Page™    August 14, 2012

Page 6

1  he need -- not, not on the other issues, Judge.  My only
2  issue, I will, I will, I will waive my right to
3  challenge all issues but the probable cause.
4          HEARING OFFICER:  Okay.  Except for the issue
5  number one?
6          MR. JOYNER:  But his, his, his stopping and
7  arresting Mr. Watson.
8          HEARING OFFICER:  Okay.  Okay.  If, if he wants to
9  go forward, I, I'll, I'll -- it's entirely up to you as
10  to -- this is your testimony that you---
11         CORPORAL ADAMS:  Yeah.
12         HEARING OFFICER:  ---want to enter in, and I
13  certainly don't want to stop you from entering in what
14  you deem necessary or what you want to so.
15         CORPORAL ADAMS:  Well, the, the rest of this will
16  be brought out at trial, so if all he's contesting is
17  probable cause, we can go with just that part.
18         HEARING OFFICER:  As long as you are okay with what
19  you have entered in at this point---
20         CORPORAL ADAMS:  Uh-huh.
21         HEARING OFFICER:  ---and y'all agree then that the
22  testimony -- or you agree that the testimony you've
23  entered is sufficient?
24         CORPORAL ADAMS:  Well, just let me finish reading
25  that.

Laura Little Reporting Service
843-393-6466

---

Transcript of Record of Hearing    Multi-Page™    August 14, 2012

Page 7

1          HEARING OFFICER:  Okay.  Yeah.
2          CORPORAL ADAMS:  That way we'll be covered.
3          HEARING OFFICER:  Okay.
4          CORPORAL ADAMS:  Let me see (inaudible), yes.
5  "Watson followed RO toward the patrol vehicle.  Watson
6  had a wide and erratic step which inferred that he was
7  impaired.  RO then turned off the blue lights for the
8  purpose of giving a field sobriety.  RO instructed
9  Watson to stand at the rear of his car.  RO turned to
10  respond to Chief Hewitt on the telephone.  When RO
11  looked back, Watson was going into the house.  RO ran to
12  the door calling his name.  When RO got to the storm
13  door, Watson was closing the wooden door and locked it.
14  Watson would not respond and would not unlock the door.
15  RO had requested that the Chief come and assist.  When
16  Chief Hewitt arrived, he also tried to talk to Watson.
17  Lieutenant Lisenby prepared a search warrant.  RO went
18  to Judge Davis' residence to get it approved and signed.
19  Upon return, Chief Hewitt and Keith Thomas from the
20  Cheraw Police Department had talked Watson into coming
21  out.  RO went into the kitchen where Chief Hewitt and
22  Watson were.  RO told Watson to place his hands behind
23  his back, he was under arrest for driving under the
24  influence of alcohol.  RO placed the cuffs on Watson,
25  led him to the patrol car without further incidence.  RO

Laura Little Reporting Service
843-393-6466

---

Transcript of Record of Hearing    Multi-Page™    August 14, 2012

Page 8

1  advised Watson of his Miranda rights.  Offered him a
2  field sobriety test which he refused prior to placing
3  him in the vehicle.  RO then looked inside of Watson's
4  vehicle for any open containers.  There were no open
5  containers, but a prominent odor of alcohol in the
6  vehicle.  There was a duty weapon laying in the front
7  seat along with two laptop computers.  Keith Thomas of
8  Cheraw Police Department took possession of the vehicle
9  and the duty weapon.  RO transported Watson to the
10  county jail and charged him with DUI.  Upon arrival at
11  the jail, RO placed Watson in the Datamaster room for
12  examination.  RO removed the cuffs and started the
13  video.  RO advised Watson of his Miranda rights again.
14  Watson then responded that he understood them.  Watson
15  refused to sign any paperwork involved with the arrest
16  and RO then asked him if he would give a breath sample,
17  which Watson refused to submit.  RO printed out a
18  "refusal", filled out the suspension form, confiscated
19  Watson's driver's license and Watson was turned over to
20  the jail personnel."  And the CAD Report from
21  Chesterfield County 9-1-1, they called me which is 7/3.
22  Said there was a suspicious vehicle, white car,
23  four-door with tinted windows in the parking lot with
24  the lights off going around in circles, forward,
25  backward and at this time, it's not wrote on the CAD

Laura Little Reporting Service
843-393-6466

Transcript of Record of Hearing    Multi-Page™    August 14, 2012

Page 9

1   report, but Bojangles is closing at this time of night.
2   There was a few older people in there eating and getting
3   ready to leave, plus the women that worked there. So
4   they felt threatened by someone in the parking lot they
5   didn't know. This car that he was driving is not a
6   marked police car. Tinted windows, a regular South
7   Carolina license tag. Nobody knew who it was at that
8   time. But while I was responding, the car matching the
9   description that they gave me was pulling out the back
10  of the parking lot onto Main Street, so I pulled in
11  behind it. This is only a quarter-mile approximately
12  from his residence, so we did not have much of a time.
13  By the time I speeded up to catch up to him, he's
14  turning in the driveway, so I hit the blue lights and
15  pull in behind him. This is not a typical DUI stop
16  where you watch the fella for two miles swerving and
17  weaving. We had no time for that. We were strictly
18  responding on a suspicious vehicle call which we get
19  several of and we respond to every one of them in the
20  same manner." And that covers that. I do have a
21  letter, a statement by Trooper Hewitt.
22      MR. JOYNER: Your Honor,---
23      CORPORAL DAVIS: Trooper Leslie Davis.
24      MR. JOYNER: I object. He, he -- that's hearsay.
25  That's (inaudible).

Laura Little Reporting Service
843-393-6466

---

Transcript of Record of Hearing    Multi-Page™    August 14, 2012

Page 10

1       CORPORAL DAVIS: Well, he was on the scene.
2       MR. JOYNER: That is hearsay what you're offering.
3   That is not allowed into evidence. I, I mean, of
4   course, it's legitimate. Forgive me, Judge. I'm sorry.
5       CORPORAL DAVIS: Yeah.
6       HEARING OFFICER: He, he's not here to---
7       CORPORAL DAVIS: Yeah. Okay. Well, we'll save
8   that for trial.
9       HEARING OFFICER: ---for cross-examination.
10      CORPORAL ADAMS: He'll be at the trial and we can
11  save that till then.
12      HEARING OFFICER: Does that complete your?
13      CORPORAL ADAMS: Yes, sir.
14      HEARING OFFICER: Cross-examination.
15      MR. JOYNER: Yes, sir.
16  CROSS EXAMINATION BY MR. JOYNER:
17  Q.  All right. And your name is Robert Adams?
18  A.  Yes, sir.
19  Q.  You work for Chesterfield Police Department?
20  A.  Yes, sir.
21  Q.  You arrested Mr. Watson on June 30th or, excuse me,
22  June 3rd, 2012?
23  A.  Yes, sir.
24  Q.  You pulled him over at 11:20 p.m.?
25  A.  Yes, sir.

Laura Little Reporting Service
843-393-6466

---

Transcript of Record of Hearing    Multi-Page™    August 14, 2012

Page 11

1   Q.  He refused to give a sample at 1:26 a.m.?
2   A.  Yes, sir.
3   Q.  You charged him with DUI?
4   A.  Yes, sir.
5   Q.  Do you have a video of his driving?
6   A.  Yes, sir, a quarter-mile.
7   Q.  You have a video of him in the BAC room also?
8   A.  Yes, sir.
9   Q.  Mr. Adams, you attended the Police Academy, did you
10  not?
11  A.  Yes, sir.
12  Q.  And part of your training is about how to create
13  police reports?
14  A.  Yes, sir.
15  Q.  Your report has to be accurate?
16  A.  Yes, sir.
17  Q.  It's got to be truthful?
18  A.  Yes, sir.
19  Q.  It has to be complete?
20  A.  Yes, sir.
21  Q.  So the police report that you just read into
22  evidence is both accurate and truthful?
23  A.  Yes, sir.
24  Q.  So you stopped Mr. Watson and your only purpose in
25  doing so was to inquire why he was in the parking

Laura Little Reporting Service

---

Transcript of Record of Hearing    Multi-Page™    August 14, 2012

Page 12

1   lot?
2   A.  Yes, sir.
3   Q.  And it's your allegation today that you had
4   probable cause to stop Mr. Watson?
5   A.  Yes, sir.
6   Q.  You had probable cause, but you didn't see any bad
7   driving at all?
8   A.  No, sir. I was only behind him a quarter-mile. I
9   was catching up.
10  Q.  You did not see any bad driving at all?
11  A.  No, sir.
12  Q.  And you didn't see any bad driving because he
13  maintained his lane the whole time?
14  A.  Yes, sir.
15  Q.  You didn't see any bad driving because he had his
16  headlights on?
17  A.  Yes, sir.
18  Q.  You didn't see any bad driving because he did obey
19  the speed limit?
20  A.  Well---
21  Q.  You didn't see any bad driving---
22  A.  I, I couldn't -- I didn't clock him, but he didn't
23  appear to be doing very much over the speed limit,
24  if any.
25  Q.  You didn't see any bad driving because he did

Laura Little Reporting Service

1        properly use his turn signal to turn into his
2        driveway?
3   A.  Yes, sir.
4   Q.  So for the record, you would say that Mr. Watson's
5        driving in no way indicates an impairment?
6   A.  Not by the driving, no, sir.
7   Q.  So his driving was perfect?
8   A.  I wouldn't say perfect.
9   Q.  What was wrong with it?
10  A.  He did drift in the lane, which most people do.
11  Q.  Okay.  That's fine.
12  A.  But he did not cross the line.
13       MR. JOYNER:  Judge, we'll play that video for you.
14  Q.  So he committed absolutely no crime?
15  A.  No.  Other than being a suspicious vehicle in the
16       parking lot.
17  Q.  Where in the law does it say that it's a crime to
18       be a suspicious vehicle?
19  A.  Nowhere.
20  Q.  Okay.  The call in this case did not allege any
21       criminal activity whatsoever, did it?
22  A.  No, sir.  Just that people were scared.
23  Q.  It did not allege any criminal activity?
24  A.  No, sir.
25  Q.  Is it legal -- you will admit now that it is legal

---

1        to drive a white car?
2   A.  Yes, sir.
3   Q.  And it is legal to be in Bojangles parking lot?
4   A.  Technically, not after closing.  They have a sign
5        up out there that the parking lot is under the
6        jurisdiction of the town police and nobody is
7        supposed to be in it after closing.
8   Q.  So it is your allegation today to this Judge that
9        it is illegal to park in the Bojangles public
10       parking lot?
11  A.  He wasn't parked.  He was riding around in circles
12       and pulling forward and backwards with the lights
13       off in a suspicious manner, and to get back to
14       the---
15  Q.  Excuse me.  Excuse me.  I ask the questions.
16  A.  Okay.
17  Q.  I'm examining you right now.  Again, for the
18       record, the call did not allege any criminal
19       activity whatsoever?
20  A.  No, sir.
21  Q.  And you stopped Mr. Watson based entirely on this
22       call?
23  A.  Yes, sir.
24  Q.  Before you made the stop, one year or two year,
25       however many, you knew who Mr. Watson was?

---

1   A.  Yes, sir.
2   Q.  And you knew he was a law enforcement officer?
3   A.  Yes, sir.
4   Q.  You knew he was an investigator?
5   A.  Yes, sir.
6   Q.  And you knew he was driving the car before you
7        pulled him over?
8   A.  No, sir.  I didn't know who was in the white car
9        till we started to turn in his parking -- in his
10       yard or driveway.  That's when I realized who it
11       was because like you said, there are a lot of white
12       cars on the road.
13  Q.  Excuse me.  I'm sorry.  Please let me answer the --
14       ask the questions and you can answer them.  You are
15       today under oath saying that you did not know he
16       was driving that car before you turned your blue
17       lights on?
18  A.  I had no way of knowing who was driving it.
19  Q.  You are saying today under oath that you didn't
20       call Chief Hewitt and discuss with him what you
21       would do about David Watson in that car?
22  A.  If it was him.  I did not know who was in the car.
23       I did not know for sure it was his car.
24  Q.  Yes or -- yes or no, did you -- you called Chief
25       Hewitt and told him that it was David Watson in the

---

1        car before you pulled it over?  You're under oath.
2        This is being recorded and we can subpoena the
3        phone records.
4   A.  As we were coming down the road and I got close
5        enough to see and he put on his turn signal, I was
6        calling Chief Hewitt, yes, sir.
7   Q.  Okay.  Okay.  So my question is this then, since
8        you did know that it was Chief Hewitt,(sic) you
9        know, why in your incident report does it say you
10       pulled him over for the purposes to identify who
11       the driver was?  Why does it say that you noticed
12       that it was David Watson, an investigator for
13       Cheraw Police Department when he got out?  Don't
14       answer.  You admit that's what you say?
15  A.  Yes, sir.
16  Q.  Okay.
17       MR. JOYNER:  Judge, I don't, I don't, I don't have
18       no more questions.
19       HEARING OFFICER:  All evidence, all testimony has
20       been completed at this time, Officer?  No new evidence
21       or testimony?
22       CORPORAL ADAMS:  I have one piece of evidence, if I
23       can, that was just given to me yesterday.  I would --
24       the reason I think that Mr. Watson---
25       MR. JOYNER:  No, I, I object.  That's hearsay.

Transcript of Record of Hearing    Multi-Page™    August 14, 2012

Page 17

1    CORPORAL ADAMS:  I think that Mr. Watson should not

2    have his license, because he's a danger to himself and

3    society, since this is not the first time stuff like

4    this has happened.

5    HEARING OFFICER:  I've noted your objection, but I

6    don't know what he---

7    CORPORAL ADAMS:  This is a Facebook posting that

8    Mr. Watson put on Facebook Monday, and I got this copy

9    last night.  It said, "Tomorrow I get to see the sorry,

10    redneck, lying Chesterfield police officer on the

11    stand."

12    MR. JOYNER:  I don't think that has anything to do

13    with it.

14    CORPORAL ADAMS:  Okay.  Well, as far as---

15    HEARING OFFICER:  It's completely irrelevant.

16    CORPORAL ADAMS:  This shows that---

17    HEARING OFFICER:  As far as to what the issue here

18    has---

19    CORPORAL ADAMS:  Uh-huh.

20    HEARING OFFICER:  ---I, I don't think that would

21    have any bearing on, on anything in there.  Nothing else

22    to add to the record here today?

23    CORPORAL ADAMS:  No, sir.

24    HEARING OFFICER:  Okay.  You have a closing?

25    CORPORAL ADAMS:  Well, in Chesterfield, we have had

Transcript of Record of Hearing    Multi-Page™    August 14, 2012

Page 18

1    several, several car break-ins.  It's been all around

2    the state and all around the county.  We have had

3    break-ins in people's storage sheds, backyards.  Any

4    suspicious car called in in the Chesterfield town will

5    be investigated under these same instances.  We will

6    stop the car and we will find out.  Even if I think I

7    know who's in the car, I'm not going to put it down till

8    I stop them, ID them, find out what they were doing

9    there.  That is our standard practice and that's the way

10    it'll be done from now on.  If a suspicious car is

11    called in for any business in town or any personal yard

12    or driveway, it will be investigated the same way.

13    HEARING OFFICER:  Closing?

14    MR. JOYNER:  Yes.  Judge, if that is standard

15    practice, then it has been standard practice to violate

16    the Fourth Amendment rights of every person they stop.

17    I have created a case law brief for Your Honor which

18    details both the United States Supreme Court cases and

19    the South Carolina.

20    MR. JOYNER:  Judge, I---

21    HEARING OFFICER:  Let him look.

22    MR. JOYNER:  Oh, sure, sure.  And both the South

23    Carolina Supreme Court juris prudence based on this.

24    Judge, number one, he had absolutely no probable cause.

25    He admitted that there was flawless driving.  He

Transcript of Record of Hearing    Multi-Page™    August 14, 2012

Page 19

1    admitted that, that there was absolutely no bad driving.

2    He used his turn signal.  He didn't speed.  He

3    maintained his lane.  Everything was perfect with the

4    driving and, Judge, under the circumstances, he doesn't

5    even have a reasonable suspicion to pull him over.  It

6    is a complete and total Constitutional violation to have

7    somebody call, an anonymous caller, and say, well,

8    somebody is in a white car and it's suspicious, that

9    doesn't give you the right to violate their Fourth

10    Amendment rights and pull them over.  I mean that is

11    just -- the United States Supreme Court in Florida v.

12    JL, which I have outlined in this case, has specifically

13    said and in the facts of that case, Judge, they had an

14    anonymous call of a person that there was actually an

15    alleged illegal activity.  They said there will be a

16    black man in a plaid shirt at the bus stop and he's

17    going to be concealing a gun illegally and in that case,

18    the U.S. Supreme Court said that is an insufficient tip

19    based on the fact that there is not enough information

20    and there is no probable cause and in our case, Judge,

21    it's even worse, because they didn't even allege an

22    illegal activity.  Every single thing he did is not even

23    indicative of a crime, and he admitted himself that not

24    -- that's not a crime.  Judge, I'd like to just say

25    reasonable suspicion it requires, and of course -- and

Transcript of Record of Hearing    Multi-Page™    August 14, 2012

Page 20

1    this is directly from Florida v. JL, the United States

2    Supreme Court case, it requires that a tip be reliable

3    in its assertion of illegality, not just in its tendency

4    to identify a determinate person.  It's very easy for me

5    to say here sits Mr. Adams.  Now, does he have a weapon

6    of mass destruction in his gun holster?  I don't -- I, I

7    mean, who knows.  Who knows, he might have some kind of

8    nerve gas, I don't know, but it's easy to identify here.

9    It's the, it's the key thing is that there is absolutely

10    no illegality, period, and he admits it and yet, we're

11    still here today fighting for something that he admits

12    he has no evidence of.  And, Judge, for that reason,

13    they 100 percent completely violated his Fourth

14    Amendment rights and I would very respectfully request

15    that you would dismiss this case, Judge, and find just

16    that they violated his rights and that they did have --

17    did not have probable cause or a reasonable suspicion to

18    stop Mr. Watson in the first place, and I thank you so

19    much for your time today.

20    CORPORAL ADAMS:  Judge, can I say one other thing?

21    MR. JOYNER:  He's already -- you've already

22    presented your closing.

23    HEARING OFFICER:  I'm going to allow him to go

24    ahead and do it.  I don't know what he wants to say.

25    MR. JOYNER:  Sure.

Page 21

1        HEARING OFFICER:  It might be irrelevant or.

2        MR. JOYNER:  Sure, Judge.

3        CORPORAL ADAMS:  Well, I, I'm not a lawyer.  I

4    don't know their terms.  I don't know their procedures

5    and -- but he's lumping the DUI in with the stop.  The

6    stop was just for ID and in the State of South Carolina,

7    we as police officers have the right to ask anybody on

8    the street for an ID or ID anybody that's in a

9    suspicious manner.  Then, when the smell alcohol come

10    from the vehicle, it changed to a DUI stop.

11        MR. JOYNER:  Okay.

12        HEARING OFFICER:  We'll review the evidence and

13    testimony presented and recorded during this hearing.

14    The case is now closed.  Did you, did you have a

15    rebuttal to what he just stated?

16        MR. JOYNER:  Judge, you know that's a completely

17    untrue statement, so I don't even need to discuss what

18    he just said.

19        HEARING OFFICER:  Okay.  The case is now closed.

# Exhibit B

STATE OF SOUTH CAROLINA  )
                         )
COUNTY OF CHESTERFIELD   )


         Transcript of Record of Dispatch Emergency
Services Telephone Call of June 2, 2012, at 22:47:55.
         Transcript prepared by Laura W. Little, Notary
Public in and for the State of South Carolina.

---

Dispatch Emergency Services Call    Multi-Page™    June 2, 2012

Page 2

1     9-1-1 OPERATOR:  Emergency Services.

2     MR. DAVIS:  Hey, This is Leslie.

3     9-1-1 OPERATOR:  Hey.

4     MR. DAVIS:  Where's Robby?

5     9-1-1 OPERATOR:  I don't know, why?

6     MR. DAVIS:  My grandmother just called me.

7  She's sitting in Bojangles.  There's a white car

8  with tinted windows come up and just parking

9  outside.  Nobody can see in it and they just want

10 somebody to come by and check it out.

11    9-1-1 OPERATOR:  It's parked outside?

12    MR. DAVIS:  Yeah.  In the gravel parking lot.

13 They just been backing up---

14    9-1-1 OPERATOR:  Uh-huh.

15    MR. DAVIS:  ---around a 18-wheeler out there.

16    9-1-1 OPERATOR:  A white car?

17    MR. DAVIS:  It's a white Ford something.  A

18 little four-door car with tinted windows.

19    9-1-1 OPERATOR:  Okay.  She's working or she's

20 just in there?

21    MR. DAVIS:  She's in there and they just can't

22 figure out what they're doing.

23    9-1-1 OPERATOR:  Okay.  What's her name, Baby?

24 Or I'll just put it---

25    MR. DAVIS:  Janet.

---

Dispatch Emergency Services Call    Multi-Page™    June 2, 2012

Page 3

1     9-1-1 OPERATOR:  I'll just put it under yours.

2     MR. DAVIS:  Okay.

3     9-1-1 OPERATOR:  Okay.  I'll send him around

4  there.

5     MR. DAVIS:  Okay.

6     9-1-1 OPERATOR:  All right.  Bye.

# Exhibit C

STATE OF SOUTH CAROLINA  )
                         )
COUNTY OF CHESTERFIELD   )


Transcript of Record of Dispatch Emergency

Services Telephone Call of June 2, 2012, at 22:49:51.

Transcript prepared by Laura W. Little, Notary

Public in and for the State of South Carolina.

LAURA W. LITTLE
LAURA LITTLE REPORTING SERVICE
POST OFFICE BOX 710
DARLINGTON, SOUTH CAROLINA 29540
843-393-6466

---

Page 2

1     OFFICER ADAMS:  Hello?

2     9-1-1 OPERATOR:  Hey.

3     OFFICER ADAMS:  Hey.

4     9-1-1 OPERATOR:  Leslie Davis just called me

5  and said --

6     OFFICER ADAMS:  Uh-huh.

7     9-1-1 OPERATOR:  -- that his grandma is in

8  Bojangles --

9     OFFICER ADAMS:  Uh-huh.

10    9-1-1 OPERATOR:  -- and there's a white car, a

11  four-door car with tinted windows that's out there

12  in the gravel parking lot part --

13    OFFICER ADAMS:  Uh-huh.

14    9-1-1 OPERATOR:  -- and he said it keeps

15  backing up and going forward and backing up and

16  going forward and been out there for a long time,

17  and they don't know what it's doing.  They want --

18  want somebody to go out there and check it.

19    OFFICER ADAMS:  Okay.

20    9-1-1 OPERATOR:  Okay.

21    OFFICER ADAMS:  And Leslie called?

22    9-1-1 OPERATOR:  Yeah, his grandma called him.

23  She's in, she's in there, but she called him.

24    OFFICER ADAMS:  Okay.

25    9-1-1 OPERATOR:  Okay.

---

Page 3

1     OFFICER ADAMS:  All right.  Thank you.

2     9-1-1 OPERATOR:  Uh-huh.

# Exhibit D

# Progressive Journal

## ˜hurman / Davis Engagement

Monday, May 9, 2011 at 4:18 pm

Rev. and Mrs. James Ronald Thurman of Ruby, announce the engagement of their daughter, Cassie Christine Thurman to Leslie Neil Davis of Chesterfield. Leslie is the son of Kenny and Joni Davis, also of Chesterfield.

The bride-elect is the granddaughter of Mr. and Mrs. Jule Smith, of Cheraw, and Mildred G. Thurman of Ruby, the late Knox Thurman and the late Neil Moore Thurman. She is a 2003 graduate of Chesterfield high School and a 2007 Winthrop University graduate with a degree in Elementary Education. She is employed by Chesterfield County School District.

The groom-elect is the grandson of the late Mr. and Mrs. James Davis of Chesterfield, and the late Mr. and Mrs. Robert Sutton of Ruby. He is a 2001 graduate of Chesterfield High School and a 2006 graduate of the South Carolina Criminal Justice Academy. He is employed as a State Trooper by the South Carolina Highway Patrol.

A wedding is planned for July 2011 at Ruby Baptist Church.



# Exhibit E

thecherawchronicle.com



Office Supplies
Binders • Calendars • Organizers • Classroom Teaching Materials
Crafts & Recreation • Desk Accessories

| Home | News | Sports | Obits | Opinion | Local Features | Calendar | Entertainment | Classifieds | Businesses | My Content |

Subscription Forms

## Mrs. Margie Gulledge Sutton

2 years ago | 516 Views | 0 💬 | 7 👍 | 📧 | 🖨



Sutton

Ruby, S.C.- Mrs. Margie Gulledge Sutton, age 86, died Thursday, Sept. 3, 2009 at her home.

A graveside service was held at 3 p.m., Saturday, Sept. 5, 2009 at Ruby Cemetery.

Visitation was held from 5 p.m. – 7 p.m. on Friday, Sept. 4, 2009 at Miller-Rivers-Caulder Funeral Home.

Mrs. Sutton was born October 1, 1922 in Ruby, SC a daughter of the late Elisha Andrew "Bub" and Rosa Cornelia Rivers Gulledge. She was a graduate of Ruby High School and a retired seamstress with Puritan Manufacturing Company. Mrs. Sutton was a member of Ruby Baptist Church. She was a wonderful seamstress, an avid gardener, and enjoyed cooking. Margie was known for her delicious pecan pies and sausage biscuits. In addition to her parents, Margie was preceded in death by her husband Robert Wilson "Rob" Sutton, three brothers; Leon, Ross, and Wilson Gulledge, and by five sisters: Mary Allen, Sallie Mae, Florence, Gladys, and Annie Lee Gulledge.

Surviving are two daughters: Denise D. Vick and Joni (Kenny) Davis of Chesterfield, S.C., five grandchildren, Kristen (Joel) McLain of Blacksburg, SC, Jason Vick of Lexington, S.C., Michael (Ivy) Davis of Mt. Pleasant, S.C., Leslie Davis of Chesterfield, S.C., and Heath Davis of Myrtle Beach, S.C., and three great grandchildren, Ethan, Emma, and Ella McLain.

Also a number of Nieces and Nephews and her special cat "Adam."

Memorials may be made to Hospice of Chesterfield County, P.O. Box 293, Chesterfield, SC 29709 or Ruby Baptist Church "Music Fund" P.O. Box 5, Ruby, S.C. 29741.

Miller-Rivers-Caulder Funeral Home of Chesterfield, S.C. (www.mrcfuneralhome.com) is serving the Sutton family.

Share This Article |

similar stories
Julia Gladys Gulledge | 8 years ago
Annie Lee Gulledge | 5 years ago
Jean Carol Donahue Gulledge | 6 years ago
Robert Wilson 'Rob' Suttton | 8 years ago
Louise Hammond Gulledge | 4 years ago

Comments (0)                    💬 Post a Comment

No Comments Yet

### Weather

Sponsored By:



Start Your Pathway To A Future

Cheraw, South Carolina
Broken clouds. Warm.
82 Degrees F
Humidity: 55% - Wind: East, 5.75 mph
Click for Detailed Forecast

We service: Toyota, Honda, Nissan, Kia, Lexus, Acura, Infiniti, Mitsubishi and all other Asian imports



### Lottery

Sponsored By:

South Carolina Lottery Jackpots

| Game | Jackpot | Draw Date |
| --- | --- | --- |
| Powerball | $50.00 Million | WED 08/22 |
| MEGA Millions | $55.00 Million | TUE 08/21 |

FAMEUP
www.fameup.tv    ⚡ @fameup

### Stocks

Sponsored By:

Office Supplies

# Exhibit F



thecherawchronicle.com

## Make your very own video player.
Take full control over your videos with Vimeo PRO. GO PRO »

| Log In

*vimeo* PRO

| Home | News | Sports | Obits | Opinion | Local Features | Calendar | Entertainment | Classifieds | Businesses | My Content |

Subscription Forms

### Esther Jones Davis

3 years ago | 155 views | 0 💬 | 4 👍 | ⌂ | 🖶

PATRICK – Esther Jones Davis died on Oct. 8, 2008.

Funeral services were at 4 p.m. Oct. 10, at Miller-Rivers-Caulder Funeral Home Chapel. Burial followed in Lower Macedonia Memorial Gardens.

Visitation was held at the funeral home Oct. 9, 6-8 p.m.

Born Feb. 10, 1932 Mrs. Davis was the daughter of the late Paul and Nezzie Boatwright Jones. She retired from Crown Cork and Seal and was a lifelong member of Lower Macedonia Baptist Church and the Senior Circle of Chesterfield County.

The widow of the late James (Jay) M. Davis, Mrs. Davis is survived by her sons, Jimmy (Ada Gardner) Davis of Chesterfield; Kenny (Joni Sutton) Davis of Chesterfield; Freddie Davis (Susan Sartor), of Cheraw; and Rusty (Martha Sessions) Davis of Timmonsville, SC.

She was preceded in death by a son, Michael Davis.

She had five grandchildren, Michael Davis of Charleston, Leslie Davis of Chesterfield, Heath Davis of Myrtle Beach, Emily Davis of Jefferson, and James Davis of Cheraw; four step-grandchildren, Larry Purvis of Chesterfield, Andrew Purvis of Chesterfield, Bo (Terra Johnson) Rouse of Florence, Dustin Rouse of Surfside Beach; and three great-grandchildren, Josh Purvis of Chesterfield, Brennyn and Johnson Rouse of Florence; and other relatives and friends.

Mrs. Davis is survived by siblings Sam Jones of Chesterfield, SC, Henley Jones of Cheraw, and Margaret Jones Hess of Charlotte, NC. Preceding her in death were two brothers, William Jones and Lloyd Jones, and a sister, Ruth Jones Davis Rivers.

Memorials may be made to Hospice of Chesterfield County, P.O. Box 293, Chesterfield, SC 29709. E-condolences may be sent to the family via the funeral home's website at www.mrcfuneralhome.com

Share This Article |

similar stories
Ruth Oliver Jones | 9 years ago
T.H. Davis | 6 years ago
Catherine Davis | 7 days ago
Kermit D. Atkins | 5 years ago
Margaret Elizabeth Haskins Beales | 3 years ago

Comments (0)                                    💬 Post a Comment

No Comments Yet

Weather

Sponsored By:



Start Your Pathway To A Future
Application deadline for Fall Semester 2012 is August 1.
Apply today online at www.uvcedu.edu or call 1-800-921-7399.

Cheraw, South Carolina
Sunny. Warm.
84 Degrees F
Humidity: 55% - Wind: Southeast, 4.59 mph
Click for Detailed Forecast



ALFREDSONS
IMPORT
REPAIR
Tom Alfredson - Owner/Technician

Hours: Monday - Friday 8:00 am to 5:30 pm
827 US Hwy 1 North | Rockingham
PH: 910.997.2797 | FX: 910.997.5023
E-mail: alfredsonsimport@bellsouth.net

Lottery

Sponsored By:

South Carolina Lottery Jackpots

| Game | Jackpot | Draw Date |
|------|---------|-----------|
| Powerball | $50.00 Million | WED 08/22 |
| MEGA Millions | $55.00 Million | TUE 08/21 |



Stocks

Sponsored By:



Copying
Buy • Lease • Rent • Cost per Copy

VISIT OUR WEB