UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| Daniel Watson, as Personal Representative of the Estate of David W. Watson, deceased,<br><br>　　　　　　　　　　Plaintiff,<br><br>　vs.<br><br>Robert A. Adams, in his individual capacity as a police officer with the, Town of Chesterfield; Eric Hewett, in his individual capacity as Chief of Police for the Town of Chesterfield; Leslie Davis, in his individual capacity as Lance Corporal with the South Carolina Highway Patrol; Town of Chesterfield; and South Carolina Department of Public Safety,<br><br>　　　　　　　　　　Defendants. | Civil Action No.: 4:12-cv-03436-BHH (Wrongful Death Action)<br><br>**Opinion and Order** |

This matter is before the Court on the defendants' motions for summary judgment (ECF Nos. 74, 75, & 76). For the reasons set forth herein, the Court grants the defendants' motions in the wrongful death action.

## BACKGROUND

This consolidated matter was filed in the Court of Common Pleas for Chesterfield County on November 2, 2012, as two separate cases, a wrongful death action, Case Number 2012-CP-13-681, and a survival action, Case Number 2012-CP-13-682. The defendants removed these cases to Federal Court because the plaintiff has asserted claims under 42 U.S.C. § 1983, raising a federal question. This action, 4:12-cv-03436-BHH (the "Wrongful Death Action"), and 4:12-cv-03437-BHH (the "Survival Action")

were assigned to the Honorable Terry Wooten, who consolidated them. The consolidated cases were reassigned to the Honorable Brian R. Harwell on January 9, 2013, and to the undersigned on June 30, 2014, shortly after briefing was completed on the defendants' motions for summary judgment. The motions for summary judgment filed in the Wrongful Death Action and the Survival Action appear to be identical. This Order addresses the motions for summary judgment in the Wrongful Death Action. The motions for summary judgment in the Survival Action are addressed in a separate order issued in that matter. The following facts are drawn from the Second Amended Complaint (ECF No. 56) and from the parties' submissions in support of or opposition to the motions for summary judgment.

The defendants in this case are three law enforcement officers, Leslie Davis ("Davis"), Robert Adams ("Adams"), and Eric Hewett ("Hewett") (collectively the "Law Enforcement Defendants") as well as the state and local authorities who employ or employed them. The defendant Adams was or is a police officer under the command of defendant Hewitt, who was or is the chief of police for the defendant Town of Chesterfield. The defendant Davis was or is a lance corporal in the South Carolina Highway Patrol, employed by the defendant the South Carolina Department of Public Safety (SCDPS). Each of the Law Enforcement Defendants is sued in his individual and official capacities.

The plaintiff, Daniel Watson ("the plaintiff") is the personal representative of David W. Watson ("Watson"), a former detective with the Cheraw Police Department. (Amend. Compl. ¶ 14.) On June 3, 2010, Watson was terminated by the Cheraw Police Department after being arrested for driving under the influence the night before. *Id.* ¶¶

17, 27. On August 29, 2010, Watson committed suicide. The plaintiff's claims arise out of an unusual series of events that led to Watson being observed, followed, stopped and ultimately arrested on the evening of June 2, 2010. The plaintiff alleges that the stop and arrest were made in violation of Watson's constitutional rights, and that his termination and suicide were proximately caused by these violations.

Around 10:30 p.m. on June 2, 2010, Watson was sitting in his unmarked police vehicle in the parking lot of a Bojangles' restaurant located at 1202 West Boulevard in Chesterfield. (ECF No. 84 at 3.) Watson was apparently attempting to use the free Wi-Fi provided by the Bojangles. *Id.* Watson's vehicle was a white Ford Taurus without a permanent tag or other markings that would distinguish it as a police vehicle. (Adams Dep. at 16.) It did however, have darkly tinted windows. *Id.* At 10:49 p.m., 911 dispatch received a call from Davis who, after asking about the location of his fellow officer, Adams, proceeded to tell the dispatcher that his grandmother was sitting at the Bojangles and called him to report that a white car with tinted windows had approached the restaurant and parked, and that people inside were scared. (ECF No. 83 at 3.) It is undisputed that Davis fabricated at least the source of this information. Neither of his grandmothers was living at the time, and a review of his phone records indicates that the only calls he made or received around the time of his call to dispatch were, in fact, to Adams and Hewett. *Id.*

Dispatch relayed the information received from Davis to Adams, who responded to the Bojangles. (Amend. Compl. ¶¶ 11-12.) On his way to the Bojangles, Adams passed a white vehicle with tinted windows headed the opposite direction. Adams turned his vehicle around and followed the white vehicle, which soon turned into a

nearby residence, which was home of Watson. Adams activated his blue lights as the white car pulled into Watson's residence. Adams admits that nothing about the way that the white car was driving gave him reasonable suspicion to initiate a stop. He stopped the vehicle based solely on the report regarding the suspicious vehicle.

Watson exited the white vehicle, and Adams, who was 6-8 feet away at the time, asked him how much he had had to drink. Watson responded that he was fine and that he had been at the Bojangles using the internet. As this exchange was taking place, Davis pulled up, and video recording from inside his vehicle shows him advising dispatch of a "possible "10-55," which is the code for a DUI. Davis approached Watson and Adams and asked Watson how much he had had to drink. Watson responded by saying something along the lines of "don't do this," to which Davis apparently responded that it was Adams' stop. Watson asked Adams and Davis what the stop was for, and Adams explained that they had received a call about a suspicious car in the Bojangles parking lot. Watson explained that he had been using the internet. Adams again asked Watson whether he had been drinking, to which Watson responded that he had not. He later admitted to the officers that he had been drinking "earlier in the day."

Davis stepped away to call Watson's supervisors, and Adams returned to his car to shut off the blue lights. At this time, Watson opened his car back up, grabbed a few items, and walked into his house. As he was doing so, Davis directed Adams not to let Watson go into the house, but before Adams could stop him, Watson closed and locked the door. Davis advised Watson's superiors that Watson was "hammered." Davis also contacted his own supervisors and advised them of the situation, but omitted his

4

involvement with the initial tip, and instead indicated that the initial tip had been for "a possible 10-55."

Hewett and other officers arrived at Watson's house and secured a warrant to enter the residence and a key from Watson's estranged wife, Mary Florence Watson ("Mary Florence"). Using the key, the officers entered Watson's home and brought him out. He declined a field sobriety test and was booked for DUI. The next day, Watson's employment with the Cheraw Police Department was terminated. Watson's driver's license was suspended, but it was reinstated following an administrative hearing on August 14, 2010, due to a finding that Adams lacked reasonable suspicion for the stop.

Mary Florence has indicated that Watson's arrest and termination was "the last straw," and she apparently broke off all attempts to reconcile with Watson thereafter. On August 29, 2012, Watson committed suicide by a self-inflicted gunshot wound. At the time of his death, Watson's blood alcohol level was .326, more than four times the level at which a person is considered intoxicated under South Carolina law. He left a note, which indicated that he was committing suicide because of the loss of his wife and his career as a detective. The plaintiff has alleged that no investigation or disciplinary action has been taken against anyone involved in the incident by Hewett, the Town of Chesterfield, or SCDPS. The defendants have not denied this allegation.

## STANDARD OF REVIEW

The court shall grant summary judgment[1] "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed.R.Civ.P. 56(c)(1).

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining

---

[1] Some of the memoranda in this case cite the standard of review for a motion to dismiss under Federal Rule Civil Procedure 12(b)(6). The Court understands the motions before it to be motions for summary judgment, especially given that the parties have attached a voluminous record to their memoranda. The plaintiff's claims in the Wrongful Death Action would be subject to dismissal under Rule 12(b)(6) because, accepting as true the well pleaded allegations of the plaintiff's complaint, the defendants are entitled to judgment as a matter of law on the grounds that they were not the proximate cause of Watson's death.

6

whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

## **DISCUSSION**

The plaintiff has brought claims under Section 1983 alleging that the defendants violated Watson's constitutional right to be free from unreasonable search and seizure by stopping him without reasonable suspicion and arresting him without probable cause. The defendants claim that they had reasonable suspicion for the stop arising out of the report of a suspicious vehicle moving around in the Bojangles parking lot around closing time and that they had probable cause to arrest Watson for DUI based on their interactions with him following the stop. Furthermore, the defendants argue that even if they lacked reasonable suspicion or probable cause, they are protected by the doctrine of qualified immunity. Additionally, Davis claims that he did not stop or arrest Watson, but merely backed up Adams, and therefore he cannot be held liable. Finally, both the

Town of Chesterfield and the SCDPS claim that the plaintiff has failed to make and support a claim of supervisory liability.

Ordinarily this Court would begin with a full qualified immunity analysis. "Because qualified immunity is 'an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Since the "driving force behind the creation of the qualified immunity doctrine was a desire to ensure that insubstantial claims against government officials will be resolved prior to discovery, the Supreme Court has repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Id.* at 231-32 (quotation marks and citation omitted). Prior to the Supreme Court's ruling in *Pearson*, courts were strictly required to analyze issues in the order set forth in *Saucier v. Katz,* 533 U.S. 194 (2001). In *Pearson*, however, the Court reversed course and gave courts increasing flexibility to approach the issues in an order that maximized efficiency. *Pearson*, 555 U.S. at 242 ("[T]he judges of the district courts and the courts of appeals are in the best position to determine the order of decision making that will best facilitate the fair and efficient disposition of each case.").[2]

In this case, the qualified immunity analysis is complicated, and the Court is not at all confident that the defendants are entitled to qualified immunity. However, it appears to the Court the defendants are clearly entitled to summary judgment on the issue of proximate cause and that the resolution of this issue disposes of this wrongful death action in its entirety. *See Scott v. Montgomery Cnty. Bd. of Educ.*, 120 F.3d 262

---

[2] The Court recognizes that *Pearson* was specifically addressed the issue of whether courts had flexibility in the order in which they approached the qualified immunity analysis, but the Court's holding appears broad enough to encompass instances like the case at hand where the matter can be clearly disposed of easily on a ground that is clear without requiring the parties to engage in any additional discovery or allowing part or all of the case to proceed to trial.

8

(4th Cir. 1997) ("Because causation is a central element to all of [the plaintiff's] claims and because [the plaintiff] has not produced sufficient evidence from which a reasonable jury could conclude that the alleged violations were a legal cause of [decedent's] suicide, the district court's grant of summary judgment in favor of the Board must be affirmed."). In the interest of avoiding a needless analysis of sensitive constitutional issues, the Court will shelve its consideration of the qualified immunity and grant summary judgment for the defendants on proximate cause. *See Pearson*, 555 U.S. at 241 ("Adherence to *Saucier*'s two-step protocol departs from the general rule of constitutional avoidance and runs counter to the older, wiser judicial counsel 'not to pass on questions of constitutionality . . . unless such adjudication is unavoidable." (citations and quotation marks omitted)). The Court has asked the parties to brief a couple of additional issues in the survival action that also arises out of the facts of this case, and, if necessary, it will address the issue of qualified immunity in the context of the Survival Action.

**Proximate Cause**

The defendants argue that, to the extent the plaintiff is seeking to recover damages for Watson's death, his claims must be dismissed because, as a matter of law, the defendants cannot be held responsible for Watson's suicide. First, the defendants argue that Watson's suicide was not foreseeable, and therefore, the plaintiff cannot establish proximate cause. Second, the defendants argue that even if Watson's suicide was foreseeable, his intentional act of taking his own life overrides any negligence or wrongdoing on their part in the appropriate comparative fault analysis.

The Court agrees with the defendants that the plaintiff cannot establish proximate cause, but declines to reach the second argument regarding comparative fault.

The defendants rely on South Carolina law in support of their proximate cause arguments, and the plaintiff did not cite contrary authority[3] or argue that South Carolina law should not govern this issue. The Court agrees that South Carolina law governs the issue of proximate cause on the state law claims and also dictates what a plaintiff must prove to maintain a "wrongful death action" under S.C. Code 15-51-10.[4] *See Missildine v. City of Montgomery*, 907 F. Supp. 1501, 1505 (M.D. Ala. 1995) (looking to Alabama state decisions to determine whether police officers could be found to have "caused" the suicide of the decedent such that the plaintiff could pursue a § 1983 claims in an action filed pursuant to Alabama's wrongful death statute).

With regard to the claims under Section 1983, "violations of constitutional rights are ordinarily governed by common law tort principles," including the requirement that the plaintiff establish both but-for causation and proximate causation. *Kane v. Lewis*, No. 14-1027, 2015 WL 1089007, at *5 (4th Cir. Mar. 13, 2015); *see* also *Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012) ("Of course, constitutional torts, like their common law brethren, require a demonstration of both but-for and proximate causation."). As the Second Circuit has explained, "[a]lthough proximate causation in the § 1983 context is a question of federal law, in determining the meaning of the concept we look to those state tort analogs, because the Supreme Court has made it

---

[3] As far as the Court can tell, there is not any governing authority that is on point and favorable to the plaintiff's position

[4] All of the plaintiff's claims that are at issue in this Order were brought pursuant to 15-51-10. *See* (Am. Compl. ¶ 8 ("Plaintiff brings all causes of action brought in this complaint pursuant to South Carolina Code § 15-51-10, Civil Action for Wrongful Act Causing Death.").)

10

crystal clear that principles of causation borrowed from tort law are relevant to civil rights actions brought under section 1983." *Barnes v. Anderson*, 202 F.3d 150, 158 (2d Cir. 1999) (quotation marks and citations omitted).  As will be discussed, South Carolina law is similar to the law of most states with regard to proximate causation in suicide cases.  Thus, the Court's discussion of this issue will focus on South Carolina law with citations to federal decisions and the decisions of other courts where appropriate.

"In actions for wrongful death, as in the case of actions for personal injuries generally, it is essential to a recovery of damages that the wrongful act or default of the defendant shall have been the proximate cause of the death resulting therefrom." *Scott v. Greenville Pharmacy*, 48 S.E.2d 324, 326 (S.C. 1948).  In *Scott*, the plaintiff filed suit against a Greenville drug store, claiming that her husband had committed suicide after becoming addicted to a barbiturate that the store sold him.  The South Carolina Supreme Court rejected the plaintiff's claims, holding that "[t]he voluntary willful act of suicide of an injured person, who knows the purpose and physical effect of his act, is generally held to be such a new and independent agency as does not come within and complete a line of causation from the injury to the death so as to render the one responsible for the injury civilly liable for the death." *Id.*

South Carolina law reflects the majority rule.  "Where an action is brought under a wrongful death statute the general rule is that suicide constitutes an intervening force which breaks the line of causation from the wrongful act to the death and therefore the wrongful act does not render defendant civilly liable" in an action "brought under a wrongful death statute."  11 A.L.R. 2d 751 (Originally published in 1950).  Most jurisdictions follow a formulation of this general rule.  *See, e.g.*, *Krieg v. Massey*, 239

11

Mont. 469, 472, 781 P.2d 277, 279 (1989) ("The general rule . . . in the area of civil liability for suicide is that negligence actions for the suicide of another will generally not lie since the act or suicide is considered a deliberate intervening act exonerating the defendant from legal responsibility." (quotation marks and citation omitted); *Gilmore v. Shell Oil Co.*, 613 So. 2d 1272, 1278 (Ala. 1993) ("[Except in limited circumstances] suicide and/or deliberate and intentional self-destruction is unforeseeable as a matter of law, and civil liability will not be imposed upon a defendant for a decedent's suicide."); *Estate of Brouhard By & Through Brouhard v. Vill. of Oxford*, 990 F. Supp. 839, 842 (E.D. Mich. 1997) ("Generally, a decedent's suicide is considered an unforeseeable intervening act between the defendants' conduct and the decedent's death."); *Johnson v. Wal-Mart Stores, Inc.*, 588 F.3d 439, 443 (7th Cir. 2009) (The "traditional rule describe[es] suicides as intervening acts that break the causal chain because of their presumptively unforeseeable nature. Most other jurisdictions utilize the same approach."). Indeed, the rule cited above is "practically unanimous." 11 A.L.R. 2d 751 (Originally published in 1950).

There are a couple of exceptions to the general rule, but neither applies in this case. "The first exception involves cases where a tortious act is found to have caused a mental condition in the decedent that proximately resulted in an uncontrollable impulse to commit suicide, or prevented the decedent from realizing the nature of his act." *McLaughlin v. Sullivan*, 123 N.H. 335, 337-38, 461 A.2d 123, 124 (1983). These cases are very rare and typically involve a physical injury that causes the decedent to have an irresistible impulse to commit suicide. *See Daniels v. New York, N.H. & H.R. Co.*, 183 Mass. 393, 399-400, 67 N.E. 424, 426 (1903). ("[W]e are of the opinion that the liability

12

of a defendant for a death by suicide exists only when the death is the result of an uncontrollable impulse, or is accomplished in delirium or frenzy caused by the collision, and without conscious volition to produce death, having knowledge of the physical nature and consequences of the act."). As far as the Court can tell, South Carolina Courts have never permitted a recovery on this basis.

A couple of states allow plaintiffs to maintain a wrongful death action where the suicide is substantially motivated by a severe intentional tort, *see, e.g., Mayer v. Town of Hampton*, 127 N.H. 81, 88, 497 A.2d 1206, 1211 (1985) ("New Hampshire law does recognize an exception to the general rule that there is no cause of action for wrongful death by suicide where the conduct of the defendant was an intentional tort and extreme and outrageous, and where this conduct caused severe emotional distress on the part of the victim which was a substantial factor in bringing about the victim's ensuing suicide."); *Tate v. Canonica*, 180 Cal. App. 2d 898, 5 Cal. Rptr. 28 (1st Dist. 1960) ("Where defendant intended, by his conduct, to cause serious mental distress or physical suffering, and does so, and such mental distress is shown by the evidence to be a substantial factor in bringing about suicide, a cause of action for wrongful death results . . ."). The plaintiff has not directed this Court to any authority suggesting that South Carolina Courts have adopted an intentional torts exception to the general rule described by the South Carolina Supreme Court in *Scott*, and the Court has not been able to find any such authority.[5]

The second category of exception applies in situations where a defendant may have a duty to prevent a foreseeable suicide because the individual at risk is in the

---

[5] Furthermore, it does not appear that such an exception is typically applied in federal actions under Section 1983.

defendant's custody and under the defendant's care. South Carolina courts have allowed plaintiffs to pursue wrongful death claims for suicide where the decedent was in the custody and under the care of the defendant, and suicide was both foreseeable and the "natural and probable consequence" of the defendants' negligence. *Bramlette v. Charter-Med.-Columbia*, 302 S.C. 68, 72, 393 S.E.2d 914, 916 (1990) (allowing the plaintiff to recover in a malpractice action for the suicide of her husband where doctors at the psychiatric hospital where he was admitted knew that the decedent was suicidal, but, nevertheless, allowed him to leave the hospital on a recreational outing with a nurse, enabling him to commit suicide by feigning illness, getting out of the van he was traveling in, and jumping off an overpass).

Additionally, there are many federal cases involving both prisoners and pretrial detainees who have committed suicide while in the custody, and recovery has been permitted in some of these cases. However, as under South Carolina law, it is the existence of a "special relationship," which is "all but synonymous with a custodial relationship," that gives rise to duties that would not otherwise exist. *See Waybright v. Frederick Cnty., MD*, 528 F.3d 199, 207 (4th Cir. 2008). As the Fourth Circuit explained in *Waybright*, "where the state is in a special relationship to a private individual, it acquires a duty to act on that individual's behalf and its failures to act are measured on a deliberate indifference standard; that is why a conscious disregard of the rights of prisoners, pretrial detainees, and committed mental patients have traditionally been examined for deliberate indifference." *Id.*

Both South Carolina and federal courts have rejected attempts to extend the duty to prevent suicide beyond the period of custody. For example, in *McKnight v. South*

14

*Carolina Department of Corrections*, 684 S.E.2d 566 (S.C. Ct. App. 2009), the family of an inmate who committed suicide while in state custody brought claims against the operators of an inpatient facility that treated the decedent for depression and attempts to harm himself.  About a year after the decedent was released from the inpatient facility and returned to prison, he committed suicide.  His family brought suit against the facility, but the trial court granted a motion for summary judgment filed by the operators of the facility on the grounds that the decedent was not in their custody at the time of his death.  The Court of Appeals affirmed.  *See id.* at 571-72.  ("McKnight asserts the trial court erred in adopting the contention that a "duty of care to prevent suicide exists only on the part of a defendant who has custody of a suicidal person."  We disagree.).

In a case with different facts but a similar outcome, Justice Souter, writing for the First Circuit, found that a plaintiff, whose decedent had committed suicide by jumping in front of a moving train approximately fourteen hours after being released from police custody, could not recover against police officers who made the decision to release him.  *Coscia v. Town of Pembroke, Mass.*, 659 F.3d 37, 38-41 (1st Cir. 2011).  The First Circuit held that the plaintiff's complaint was subject to dismissal, despite the fact that the plaintiff had alleged that the decedent had exhibited suicidal behavior while in police custody, including attempts to lick an electrical outlet.  *See id.* at 38.  In ruling for the officers, the First Circuit emphasized the duty the police officers and prison officials have to take reasonable measures to prevent suicide by arrestees, detainees, or prisoners "rests on the fact of custody, 'because the prisoner is unable by reason of the deprivation of his liberty [to] care for himself.'"  *Id.* at 40 (quoting *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.,* 489 U.S. 189, 201 (1989)).  As these cases

make clear, police officers, prison officials, and others who acquire custody over others will not typically be held liable for the suicide of a person who is no longer in their custody.

In *Coscia*, Justice Souter did note that the plaintiff had not alleged that the risk of suicide had been created by the officers. *Coscia*, 659 F.3d at 40. In this respect, it is distinguishable from the case at hand. While *Coscia* could be read as holding the possibility that a plaintiff could pursue a claim under the "state created danger" theory established in *DeShaney*, the plaintiff has not made this argument. As this Court has previously observed, "the Supreme Court and the Court of Appeals have given little definition to the state created danger exception, and the *DeShaney* Court did little more than imply that the exception existed." *Polcyn v. Martin*, No. CIV.A. 6:03-2327-HFF, 2005 WL 2654259, at *9 (D.S.C. Oct. 17, 2005). The Court does not understand the plaintiff to have advanced a due process claim that would implicate *DeShaney*, but even if he had, the Court can find no authority to support the proposition that a wrongful seizure or arrest that leads to a suicide is a state created danger. Indeed, the only federal authorities this Court has been able to locate with facts analogous to this case support the conclusion that the plaintiff may not recover. *See, e.g., Estate of Brouhard By & Through Brouhard v. Vill. of Oxford*, 990 F. Supp. 839, 842 (E.D. Mich. 1997) (relying on the general rule that "a decedent's suicide is considered an unforeseeable intervening act between the defendants' conduct and the decedent's death" and noting that the plaintiff had not produced "evidence which would be sufficient to establish a causal relationship between the alleged wrongful conduct by the officers and the suicide of [the decedent]" they allegedly falsely arrested and abused).

16

In analyzing facts leading to Watson's suicide, the Court relies primarily on the report of the plaintiff's expert, Dr. Ronald Maris. (*See* ECF No. 83-16). Pursuant to the South Carolina rule and the common law majority rule, the plaintiffs cannot show that the defendants were the proximate cause of Watson's suicide because suicide is considered an intervening force sufficient to break the chain of causation from the defendants' alleged wrongful acts to Watson's death. Moreover, in the absence of evidence that Watson committed suicide in the custody of the defendants or suffered an injury at their hands that created an irresistible impulse to commit suicide, he does not fall within any of the exceptions to the rule. It is undisputed that Watson took his life in his own home almost three months after he was arrested, and the plaintiff has not alleged that Watson had an irresistible impulse to commit suicide as a result of an injury inflicted by the defendants. Accordingly, under the general rule, the plaintiff cannot establish that the defendants were the proximate cause of Watson's death.

Were this not enough, there are three additional factors that further attenuate proximate causation in this case.

1. **Time**

The first factor is the passage of time between Watson's arrest on or around June 2, 2010, and his suicide on August 29, 2010, almost three months later. The plaintiff argues that Watson's death by suicide was foreseeable because of a comment Davis made after Watson had locked himself inside of his home on June 2, 2010. Davis allegedly remarked, "well it's a good thing as long as they stay on the telephone we won't hear a gunshot." (Davis Dep. at 131.) Davis admitted that he was referring to the possibility that Watson might shoot himself when he made this comment. *Id.* at 131-32.

17

The fact that Davis considered that Watson might harm himself at a time when he was barricaded inside his home, (allegedly) intoxicated, and facing arrest does not automatically make his suicide three months later foreseeable. Moreover, any duty that Davis and the other defendants might have had to prevent Watson from hurting himself as they took him into custody would no longer be present three months later at the time of his death when he was not in their custody. *See, e.g.*, *McKnight*, 684 S.E.2d at 570 (citing with approval cases holding that the passage of time undermined probable cause).

### 2. **Outside Decision Makers**

The second factor is the substantial influence of decision makers who are not defendants in this case. Dr. Maris suggested that there were two significant changes to Watson's circumstances that contributed to his death, the loss of his marriage and his job. (See Maris Report at 8-9, 14) ("A series of handwritten suicide notes (goodbyes apologies, a will, funeral wishes, and an explanation of why he was suiciding) were found at the scene, which indicated that David had lost hope, lost his marriage and career . . . . He said in his suicide notes that he felt he would never become a Detective again nor be able to recover from his failed marriage to Mary Florence and start over. . . . The central theme in David's notes was that his marriage and career as a police Detective were over and that he had lost hope."). Although the plaintiff alleges that the defendants' actions caused Watson's suicide, the end of his marriage and the loss of his job required decisions by his wife and the Cheraw police department, and neither of them were named as defendants in this case. Even if Watson's arrest was the predictable "straw that broke the camel's back," for his marriage and his job, the

18

defendants cannot be held responsible for the decisions of third parties and the various preexisting factors that may have influenced their decisions. As the district court for the Eastern District of Michigan observed rejecting claims brought by a plaintiff whose decedent allegedly committed suicide as a result of employment discrimination:

> Of course, plaintiff would contend that if the discharge were at the core of the snowball then the causal requirement is met. This reading of causation is untenable, however, because, as I have suggested, the interconnection between life experiences is virtually infinite; to permit liability to attach merely because one event triggered other experiences which combined to create an unbearable circumstance for Mr. Jamison would be to expand the concept of causation beyond manageable bounds.

*Jamison v. Storer Broad. Co.*, 511 F. Supp. 1286, 1292-93 (E.D. Mich. 1981).

### 3. Intoxication

Finally, it is undisputed that Watson was severely intoxicated at the time he took his own life. According to the Maris Report, his blood alcohol level was .326, over four times the legal limit for drunkenness in South Carolina. (Maris Report at 9.) It is impossible to know what, if any, effect Watson's struggle with alcoholism in general, and his severe intoxication on the night of August 29, 2010 in particular, had upon his suicide.

These factors might otherwise be considerations for the jury but for the general rule that suicide, except with limited exceptions not applicable here, breaks the chain of proximate causation. But taken together with the general rule, they make it overwhelmingly clear that the plaintiff cannot maintain this wrongful death action. Although the Court sympathizes with the plaintiff and is troubled by the allegations against the defendants, it is compelled to agree with the defendants that, even with all

facts construed in his favor, the plaintiff cannot establish that the defendants were the proximate cause of Watson's death.

## CONCLUSION

For the reasons set forth above, the defendants' motions for summary judgment (ECF No. 74, 75, 76) are granted in the wrongful death action only. The motion in limine (ECF No. 90) is moot. The survival action will be addressed in a separate order.

**IT IS SO ORDERED.**

s/ Bruce Howe Hendricks
United States District Judge

March 31, 2015
Greenville, South Carolina